ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
          sean@mlolegal.com

*Lead Counsel for Lead Plaintiffs*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE PAYSIGN, INC. SECURITIES LITIGATION | Case No. 2:20-cv-00553-GMN-DJ<br><br>Hon. Gloria M. Navarro<br><br>CLASS ACTION<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>This Document Relates To: All Actions |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Johann Francisconi and Raheel Shahzad (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, through their undersigned attorneys, for their Consolidated Amended Class Action Complaint (the "Complaint") against Defendants (as defined below), allege the following based upon personal knowledge as to those allegations concerning themselves and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of the Defendants' public statements and filings made with the United States Securities and Exchange Commission (the "SEC"), wire and press releases issued by or regarding Paysign, Inc. ("Paysign" or the "Company" formerly known as 3PEA International Inc. ("3PEA")), analysts' reports and advisories about the Company, information obtained from interviews with knowledgeable former employees of the Company, and other public information.  Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons or entities that purchased or otherwise acquired Paysign's common stock during the period from March 12, 2019 through March 31, 2020, both dates inclusive (the "Class Period").  The Class is seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendants informed investors that Paysign's failure "to comply with the requirements of the Sarbanes-Oxley Act" or of "additional deficiencies in our internal control over financial reporting that are deemed to be material weaknesses," could cause the market price of Paysign securities to decline. Nevertheless, during the Class Period, Defendants knew of or recklessly disregarded existing, material deficiencies in Paysign's internal controls.  At the end

of the Class Period, Defendants admitted that material deficiencies in the Company's internal controls existed throughout the Class Period, and the market price of Paysign's common stock then fell precipitously on unusually heavy trading volume.

3.    Paysign is a card payment solutions provider and an integrated payment processor based in Henderson, Nevada that services prepaid debit cards sponsored by other companies.  On April 23, 2019, the Company changed its name from 3PEA to Paysign.  The Company earns revenue from services such as transaction processing, cardholder enrollment, value loading, account management and customer service-related activities.

4.    On four separate occasions during the Class Period, the Company stated in its Annual and Quarterly reports filed with the SEC that its Chief Executive Officer ("CEO"), Defendant Mark Newcomer ("Newcomer"), and its Chief Financial Officer ("CFO"), Defendant Mark Attinger ("Attinger") personally evaluated the effectiveness of the Company's internal controls over financial reporting, and based on their evaluations, Paysign's internal controls and procedures were effective.  Paysign's Annual Report issued during the Class Period was signed by Newcomer, Attinger and Defendant Daniel Spence ("Spence"), the Company's Chief Technology Officer ("CTO").  Newcomer and Attinger also signed the 2019 Form 10-Q quarterly reports issued by the Company during the Class Period that contained similar misrepresentations about the effectiveness of Paysign's internal controls.  Newcomer and Spence are the beneficial owners collectively of 36% of the Company's outstanding shares of common stock.

5.    Unbeknownst to investors, however, Defendants knew or recklessly disregarded numerous facts that put them on notice of material and persistent weaknesses in the Company's internal controls.  For example, throughout the Class Period, Defendants employed an accountant named Arthur De Joya ("De Joya") even though he was prohibited from practicing as an

accountant pursuant to an SEC cease and desist order.  Indeed, the Defendants had De Joya work on the preparation of the Company's financial statements for fiscal years 2017, 2018 and 2019.

6.     De Joya was well known to the Defendants because he worked for Paysign for several years, served as its CFO from 2007 to 2015, audited its financial statements as the Company's outside auditor and, according to Confidential Witnesses ("CW"), sat in an office next to Newcomer's and Attinger's offices while working closely with these Defendants.  It was widely known throughout the Company that De Joya's suspension legally prohibited from performing certain tasks at Paysign.

7.     De Joya was suspended from practicing or appearing before the SEC because he egregiously ignored the signs of an elaborate fraud associated with the audit of another company, which the SEC found amounted to no audit at all.  The SEC's September 2015 cease and desist order against De Joya, entered with his consent, was posted on the SEC's website in 2015. Moreover, to this day, the Nevada State Board of Accountancy's ("NSBA") website shows that De Joya's accounting firm surrendered its accounting license in December 2015 as a result of the SEC's enforcement action.  De Joya himself was subject to a disciplinary action by the NSBA that resulted in the imposition of probation from June 9, 2016 to December 9, 2018, meaning that he could not apply to practice before the SEC until the end of 2018.  OTC Markets Group ("OTC Markets") continues to list De Joya as a prohibited accountant.  Furthermore, the Company has admitted that De Joya's assistance in preparing the Company's financial statements for 2019 was impermissible because he was "barred" from practicing or appearing before the SEC.

8.     Defendants also knew about or recklessly disregarded other material weaknesses in the Company's internal controls over financial reporting during the Class Period.  According to a CW who directly worked with and met with Defendant Attinger and discussed the matter

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

with him, Paysign's revenue and cashflow figures were inaccurate, and the CW worked with Defendant Attinger in late 2019 to correct the mistakes in the Company's general ledger accounts, and amend its journal entries due to the material errors.

9.      Defendants also knew of or recklessly disregarded internal weaknesses during the Class Period in Paysign's information technology general controls.  Another CW confirms that Defendant Spence, the CTO of the Company during the Class Period, made software changes to the Company's internal system that created discrepancies and thus caused customers' account balances to materially differ from their correct and actual balances.  According to this CW, Defendant Newcomer also knew about the software changes made by Defendant Spence as well as its effect on customers' debit card balances to materially differ from their actual amounts.

10.      The Defendants made additional misrepresentations during the Class Period.  In the Company's Annual Report filed in the beginning of the Class Period on March 12, 2019, the Defendants misleadingly claimed that their failure to (a) retain highly skilled personnel in finance *may* harm the Company's operations, (b) maintain internal controls to prevent additional deficiencies *may* result in the untimely filing of the Company's financial statements, and (c) prevent "improper operations" or other events *may* harm the Company's business or reputation. However, every one of these events was not contingent because they had already occurred before or during the Class Period.

11.      On March 16, 2020, the Company announced a delay in the filing of its Annual Report for 2019 because of a material weakness in its internal controls over financial reporting and information technology general controls.

12.      On this news, the price of Paysign's common stock declined by nearly 17% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020,

4

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

on heavy trading volume.  The price of Paysign's common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020.

13.     On March 31, 2020, Paysign issued a press release to announce that the Company would again postpone its earnings results call scheduled for that same day "to complete its year-end closing procedures."

14.     On this news, the price of Paysign's common stock declined by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020.  The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share.

15.     Moreover, in violation of their duty to disclose all material information or refrain from trading, Defendants Newcomer and Spence took advantage of Paysign's artificially inflated stock price, selling during the Class Period over $3.5 million in stock.  These stock sales were dramatically out of line with Defendants Newcomer's and Spence's prior trading activity.  In fact, these Defendants did not sell any stock in the twelve months before the Class Period.

16.     After the end of the Class Period, in April 2020, the Company admitted that material weaknesses in its internal controls over financial reporting existed as of December 31, 2019, including "lack[ing] sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018, and 2019."   As for the information technology general controls, the Company admitted that the material weaknesses in internal controls related to software updates.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) given that a significant portion of the Defendants' misconduct took place within this District.  Paysign is a corporation incorporated in Nevada with its principal place of business in Henderson, Nevada, and Defendants Mark Newcomer and Mark Attinger reside in or around the Las Vegas metropolitan area.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22.     Plaintiff Johann Francisconi purchased Paysign common stock during the Class Period as reflected in the loss analysis he submitted to this Court in support of his appointment as lead plaintiff (ECF No. 8-3) and suffered damages as a result of the federal securities laws violations alleged herein.

23.     Plaintiff Raheel Shahzad purchased Paysign common stock during the Class Period as reflected in the loss analysis he submitted to this Court in support of his appointment as lead plaintiff (ECF No. 8-3) and suffered damages as a result of the federal securities laws violations alleged herein.

24.     Defendant Paysign is a Nevada corporation with its principal executive offices located at 1700 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89012. From 2006 through April 23, 2019, Paysign was known as 3PEA.[1] The Company's securities trade on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "PAYS."

25.     Defendant Newcomer was, at all relevant times, Paysign's co-founder, President, CEO and a member of the Company's Board of Directors.  Newcomer owns 18.4% of the outstanding shares of the Company's common stock.

26.     Defendant Attinger was, at all relevant times, Paysign's CFO and Treasurer.

27.     Defendant Spence was, at all relevant times, Paysign's co-founder, CTO and a member of the Company's Board of Directors.  Spence owns 17.9% of the outstanding shares of the Company's common stock.

28.     Defendants Newcomer, Attinger and Spence are sometimes referred to herein collectively as the "Individual Defendants."

29.     Paysign and the Individual Defendants are collectively referred to herein as "Defendants."

30.     The Individual Defendants possessed the power and authority to control the contents of Paysign's SEC filings, press releases, and other communications made to the

---

[1] Unless necessary for context, this Complaint refers to Paysign and 3PEA as "Paysign" or the Company.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Company's investors.  The Individual Defendants were provided with copies of Paysign's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Paysign, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

31.     Paysign is a card payment solutions provider and an integrated payment processor. The Company was founded in 2001 by Defendants Newcomer and Spence.  On October 19, 2006, the Company changed its name to 3PEA.  On April 23, 2019, the Company amended its articles of incorporation to change its name to Paysign, changing its NASDAQ trading symbol to "PAYS."  As of March 3, 2020, Paysign had seventy employees and independent contractors.

32.     The Company provides prepaid card programs and processing services for corporate, consumer and governmental applications, enrolling cardholders, loading cards with value, processing transactions, managing accounts, and providing customer service.   The Company derives revenue from program set-up, customization, data processing and report generation, card production, transaction fees generated from card usage, inactivity fees, card replacement fees, administration fees and settlement income.

33.     The Company generates most of its revenue from the plasma donation and pharmaceutical industries.  In 2019, nearly 78% of the Company's revenues were from plasma

industry payment solutions.  Paysign provides and services prepaid debit cards by which Plasma donation centers compensate volunteer donors.

34.     For the pharmaceutical industry, Paysign provides payment claims processing and other administrative services for patients' out-of-pocket costs related to prescription drug purchases and adjunctive therapies.  Payment solutions provided by Paysign include pharmacy claims adjudication, network and payment administration, client call center service and support, reporting, rebate management and account management.  In 2019, nearly 20% of the Company's revenue was generated from solutions provided to the pharmaceutical industry.

**Paysign Has a History of Lax Accounting Oversight and Misrepresentations Made to Investors**

35.     Prior to the year 2008, the Company's financial statements were audited by De Joya & Company ("De Joya & Co.).  De Joya was the principal of De Joya & Co.  De Joya audited the Company's financial statements and simultaneously served as its CFO from 2007 to 2015.  In September 2015, the SEC sanctioned De Joya for willfully violating Section 17(a) of the Securities Act and Rule 2-02 of SEC Regulation S-X, and prohibited him from appearing or practicing before the SEC as an accountant for three years.

36.     Between 2008 and its resignation in 2017, Sarna & Company ("Sarna") served as Paysign's independent registered public accounting firm, auditing its financial statements.[2] Sarna was a solo practitioner with two staff members.  In February 2017, the Public Company Accounting Oversight Board ("PCAOB"), a quasi-public agency appointed by the SEC to oversee

---

[2] As Paysign stated in its 2015 10-K, Sarna also served as its "principal accountants."  To promote "objectivity," Paysign's Board "restricted the non-audit services" Sarna could provide "to tax services and audit related services" and "non-audit services . . . when the services [Sarna] offered . . . are more effective or economical than services available from other service providers, and, to the extent possible, only after competitive bidding."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the audits of public companies and SEC-registered brokers and dealers and regulate, inspect or discipline accounting firms that audit public companies, published a scathing report regarding Sarna's audits of the Company's financial statements, concluding that Sarna issued an opinion "without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misrepresentations."[3] Specifically, the PCAOB identified the "failure to perform sufficient procedures to test revenue recognition" as the audit deficiency that did not provide reasonable assurance that the Company's financial statements did not contain material misrepresentations. *Id.* The PCAOB further concluded that Sarna's failure to sufficiently test revenue recognition procedures was attributable to a lack of "due professional care." *Id.* at 11.

37.     In April 2017, Sarna informed the Company that it would be unable to continue as the company's principal independent registered public accounting firm, and subsequently withdrew its registration with the PCAOB.

38.     The Company subsequently hired Squar Milner LLP ("Squar") as its auditor in 2017. Squar "audited" the Company's materially false and misleading financial statements included in the Annual Report on Form 10-K filed with the SEC for the year that ended on December 31, 2018 ("2018 10-K"). Squar also audited the financial statements of Pareteum Corporation, a company associated with insiders repeatedly accused of stock promotion schemes and other misconduct, which was also accused of accounting fraud in the summer of 2019 and has admitted that its financial statements cannot be relied upon by investors. On July 2, 2020,

---

[3] *See* PCAOB Report on 2016 Inspection of Sarna & Company, Certified Public Accountants, available at https://pcaobus.org/Inspections/Reports/Documents/104-2017-080-Sarna.pdf, at 4.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Paysign filed a current report on Form 8-K, informing investors that it dismissed Squar and appointed BDO USA, LLP as the Company's new public accounting firm.

39.    In addition, the Company has admitted that its 2018 10-K, the Annual Report with numerous false statements described below, contains materially false and misleading statements. In the 2018 10-K, Paysign falsely stated that "we protect our intellectual property rights through a combination of trademark, patent, copyright and trade secrets laws."  In the notes to the Consolidated Financial Statements of the 2018 10-K, the Company claimed that the Company owned "Patents and trademarks" valued at $36,073. On September 9, 2019, the Company admitted in a Form 8-K filed with the SEC that these statements were false and misleading.  In relevant part, the Company conceded that "we erroneously disclosed in our Annual Report on Form 10-K for the fiscal year that ended December 31, 2018 that we have patents, *which we do not*." (Emphasis added).

**Defendants Knowingly or Recklessly Allowed De Joya to Assist in the Preparation of the Company's Financial Statements**

40.    De Joya joined the Company in 2007, serving as its CFO from 2007 to 2015.  De Joya was also the principal partner of both De Joya & Co. and De Joya Griffith LLC ("DJGL"). De Joya & Co. audited the Company's financial statements before it retained Sarna in 2008.

41.    In January 2015, the SEC announced that it had brought an enforcement action against DJGL and De Joya, himself, in connection with a fraud scheme perpetrated by a Canadian stock promoter related to 20 purported mining companies.  On September 18, 2015, De Joya and DJGL consented to the entry of a Cease-and-Desist Order ("Cease and Desist Order") prohibiting De Joya from appearing or practicing before the SEC as an accountant for three years.  DJGL was

prohibited from appearing or practicing before the SEC as an accountant for five years.[4] According to the NSBA's website, DJGL surrendered its accounting license in December 2015 as a result of the SEC's enforcement action.   De Joya was subject to a disciplinary action by the NSBA that resulted in the imposition of probation from June 9, 2016 to December 9, 2018.

42.    Per the Cease and Desist Order, on or about November 2011, Jonathan Briner ("Briner"), an attorney prohibited from practicing before the SEC at that time for engaging in a pump-and-dump and market manipulation scheme, contacted DJGL to conduct audits of nine issuers' financial statements that were to be included in Form S-1 registration statements filed with the SEC.  De Joya was the engagement quality review partner for audits related to two of these entities.

43.    Among red flags the Cease and Desist Order identified that De Joya, himself, ignored were DJGL staff emails alerting him to the fact that Briner had been involved in dozens of fraud schemes that resulted in millions of dollars lost by thousands of investors.  De Joya and his DJGL partners discussed Briner's history of fraudulent schemes during face-to-face meetings, yet they continued their relationship with the Briner related entities.  The Cease and Desist Order concluded that DJGL and its affiliates ignored red flags in accepting and continuing with the issuers as clients, failed to respond to serious concerns that Briner may have been engaging in a fraud, failed properly to audit the issuers' cash, ignored red flags that Briner engaged in sham

---

[4] The SEC interprets the term "practicing" broadly to include not just the ultimate documents filed with the SEC, but "computing the figures and supplying the data incorporated into Commission filings and consenting to their incorporation."  *See SEC v. Hooper*, No. 2:16-mc-00022-MKD, 2017 U.S. Dist. LEXIS 223004, at *13 (E.D. Wash. Aug. 10, 2017) (internal citations and quotation marks omitted).  The federal courts have adopted this broad interpretation of what it means to "practice" before the Commission. *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

transactions, and disregarded basic accounting errors and inconsistencies between the financial statements and registration statements.

44.     The Cease and Desist Order is publicly available and De Joya to this day is identified as one of only 96 prohibited accountants in the United States by OTC Markets, a financial market that provides price and liquidity information for nearly 10,000 over-the-counter securities.

45.     Despite knowing of his past problems with the SEC and that OTC Markets continued to identify De Joya as a prohibited accountant for its 10,000 listed securities, Defendants hired De Joya to Paysign's accounting function, situating his office next to the Individual Defendants', permitting him to participate in accounting matters related to the preparation of Paysign's financial statements for 2017-2019.

**Confidential Witnesses**

46.     CW1 was a Senior Accountant at the Company from November 2015 to July 2016. CW1 shared an office with De Joya.  CW1 confirms that De Joya was regularly in the Company's headquarters, and that he worked on the Company's financial statements and other public documents prepared to be filed with the SEC.

47.     CW2 was a Corporate Trainer at Paysign from October 2018 to September 2019. As a Corporate Trainer, CW2 developed a training program and materials for the Company's Customer Service Representatives.  CW2 also trained Defendant Newcomer on how to use the Company's central service desk where employees could create tickets for problems that were handled by the Company's IT department.  According to CW2, De Joya worked in the Accounting department in Paysign's headquarters and his office was located in the main office next to the Individual Defendants' offices.

13
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

48.     CW2 also served as a Customer Service Representative, fielding calls for Paysign's customers, who utilized its customer service offerings for the ultimate prepaid card holders.   CW2 stated that Defendant Spence regularly made programming changes to the Company's internal system that stored customer account profiles without providing other employees with notice that he had done so.   According to CW2, Defendant Spence's changes to the internal system's software caused customers' account balances to materially differ from the actual balances on their accounts.   As a result, many customers called Paysign and complained about the discrepancies where the balances that appeared on their cards differed from the actual balances that they had last seen themselves after using the cards, but CW2 and other Customer Representatives were unable to provide the customers with reasons for the discrepancies in their account balances.   CW2 further states that this issue was widely known throughout the Company; that this was known to the Company's COO, Joan Herman, who in turn, informed Defendant Newcomer about the disruptive changes Defendant Spence made, which caused Paysign to miscalculate balances on cardholder accounts.

49.     CW3 was the Senior Director of Pharmaceutical Account Management at the Company from April 2018 to January 2019.   CW3 developed a payment vehicle for payment programs utilized by the pharmaceutical industry, discussed terms with service providers concerning redemption funding, and priced contracts to specify the scope of projects.   In December 2018, CW3 learned that De Joya worked directly with Defendant Newcomer to develop processes related to the utilization of MasterCard and Visa as payment solutions within the Company's Reward and Plasma groups.   CW3 stated that it was known by employees within the Company that De Joya was "not legally able to" perform certain tasks.

50.     CW4 was a Call Center Manager at the Company from April 2016 to January 2020.  CW4 managed all customer employees who fielded calls from the Company's customers.  CW4 directly reported to the Company's Chief Operating Officer, Joan Herman, who in turn reported to Defendant Newcomer.  CW4 recalled that De Joya was regularly in the Company's headquarters beginning in the middle of 2018.  According to CW4, De Joya told CW4 that he had worked closely with Defendant Newcomer for years.  CW4 stated that De Joya's office was right next to Defendant Attinger's office, and De Joya also worked closely with Defendant Attinger.

51.     CW4 also corroborated CW2's account.  CW4 confirmed that CW4 also fielded calls from cardholders, who told CW4 that there were changes made to the actual balances of their prepaid cards, and CW4 states that the IT department's software updates caused this problem.

52.     CW5 was a front-end developer in Paysign's IT department from May 2018 to October 2019.  In Paysign's 2019 10-K, the Company explained that a material weakness in the Company's information technology controls related to access to "privileged user accounts," and "change management to financial applications."   CW5 explained that "change management" refers to managing software updates such as releasing new updates or notifying users that a new version of the software is available.

53.     Given that the "change management" deficiency was created by Defendant Spence, and Defendant Newcomer knew about this issue during the Class Period, Defendants either knew or recklessly disregarded that material weaknesses in internal controls related to information technology general controls existed throughout the Class Period.

54.     CW6 was an Accounting Manager at Paysign from November 2019 to December 2019, who directly worked for Defendant Attinger.  CW6 analyzed the Company's accounts

payable and corrected accounting errors in the Company's journal entries.  CW6 stated that the Accounting department at Paysign consisted of five individuals, including CW6, a controller and Defendant Attinger.  The Company designated CW6 as the "clean up person" for the "mess" in Paysign's accounting entries.  According to CW6, Paysign's calculations for the Company's revenues contained material errors because the controller failed to initiate an automatic feed that transferred the Company's bank account information into NetSuite, an accounting software used by the Company.  CW6 further stated that Defendant Attinger was told about the Company's inability to properly recognize revenue due to a failure to properly transfer the correct information to NetSuite. At the end of 2019, CW6 worked directly with Defendant Attinger to correct the material errors in the Company's general ledger, amending journal entries to fix the errors.  CW6 confirms speaking with Defendant Attinger directly about the accounting errors, and states that another Paysign employee with a CPA license also discussed the accounting errors with Defendant Attinger in person.

**Materially False and Misleading Statements Issued During the Class Period**

55.     The Class Period begins on March 12, 2019, when the Company filed its 2018 10-K that Defendants Newcomer, Attinger, and Spence signed.  The 2018 10-K contained the following materially misleading statements concerning a risk of a failure to retain key employees that could impair the Company's operations, but this risk had already come to pass:

> **We depend on key personnel and could be harmed by the loss of their services because of the limited number of qualified people in our industry.**
>
> Because of our small size, we require the continued service and performance of our management team, sales and technology employees, all of whom we consider to be key employees. Competition for highly qualified employees in the financial services and healthcare industry is intense. ***Our success will depend to a significant degree upon our ability to attract, train,***

> *and retain highly skilled directors, officers, management, business, financial, legal, marketing, sales, and technical personnel and upon the continued contributions of such people. In addition, we may not be able to retain our current key employees. The loss of the services of one or more of our key personnel and our failure to attract additional highly qualified personnel could impair our ability to expand our operations and provide service to our customers.*

56. The statements identified in Paragraph 55 were materially misleading when made because Defendants (a) knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, and as a result (b) the Company's "success" based on the retention of "highly skilled" personnel in finance was already impaired at the time these statements were made.

57. The 2018 10-K further contained the following materially false and misleading statements concerning the Company's inability to comply with SOX or timely identify material deficiencies and weaknesses in the Company's internal controls, but this risk had also actualized:

> **We Incur Significant Costs As A Result Of Operating As A Public Company. We May Not Have Sufficient Personnel For Our Financial Reporting Responsibilities, Which May Result In The Untimely Close Of Our Books And Record And Delays In The Preparation Of Financial Statements And Related Disclosures.**
>
> As a registered public company, we have experienced an increase in legal, accounting and other expenses. In addition, the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), as well as new rules subsequently implemented by the SEC, has imposed various requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased our legal and financial compliance costs and make some activities more time-consuming and costly. *If we are not able to comply with the requirements of Sarbanes-Oxley Act, or if we or our independent registered public accounting firm identifies*

17

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

> *additional deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the SEC and other regulatory authorities.*

58. The statements identified in Paragraph 57 were materially misleading when made because with actual knowledge that ineffective internal controls over financial reporting, themselves, could cause Paysign's stock price to decline, Defendants knowingly or recklessly disregarded that material weaknesses in internal controls over financial reporting already existed, including their (a) knowingly or recklessly employing an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, (b) knowingly or recklessly disregarding that Paysign's revenue and cash flow figures were inaccurate and the Company's general ledger entries contained errors during the Class Period, and (c) knowingly or recklessly disregarding that software changes made by Defendant Spence caused inaccurate balances to be reported on cardholder accounts.

59. The 2018 10-K contained the following materially misleading statement concerning risks to the Company from "improper operations" or other events that could harm its business or reputation:

> **Our business is dependent on the efficient and uninterrupted operation of computer network systems and data centers.**
>
> Our ability to provide reliable service to our clients and cardholders depends on the efficient and uninterrupted operation of our computer network systems and data centers as well as those of our third party service providers. Our business involves movement of large sums of money, processing of large numbers of transactions and management of the data necessary to do both. Our success depends upon the efficient and error-free handling of the money. *We rely on the ability of our employees, systems and processes and those of the banks that issue our cards, our third party service providers to process and facilitate these transactions in an efficient, uninterrupted and error-free manner.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

In the event of a breakdown, a catastrophic event (such as fire, natural disaster, power loss, telecommunications failure or physical break-in), a security breach or malicious attack, ***an improper operation or any other event impacting our systems or processes, or those of our vendors, or an improper action by our employees, agents or third-party vendors, we could suffer financial loss, loss of customers, regulatory sanctions and damage to our reputation***. The measures we have taken, including the implementation of disaster recovery plans and redundant computer systems, may not be successful, and we may experience other problems unrelated to system failures. We may also experience software defects, development delays and installation difficulties, any of which could harm our business and reputation and expose us to potential liability and increased operating expenses. We currently do not carry business interruption insurance.

60.     The statements identified in Paragraph 59 were materially misleading when made because (a) a material weakness in the Company's information technology general controls existed at that time, (b), the material weakness was knowingly or recklessly caused by Defendant Spence, and led to inaccurate balances tabulated for cardholder accounts, and as a result (c) "improper operations or other events" already existed and had caused harm to the Company's business and reputation at the time these statements were made.

61.     In addition, the 2018 10-K contained the following materially false and misleading statements regarding the effectiveness of the Company's internal controls over financial reporting as of December 31, 2018:

Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2018. ***Based on that evaluation, our chief executive officer and chief financial officer concluded that, as of the evaluation date, such controls and procedures were effective.***

* * *

As of December 31, 2018 we conducted an evaluation, under the supervision and with the participation of our chief executive officer (our principal executive officer), our chief operating officer and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or the COSO Framework. Management's assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls.

A material weakness is defined within the Public Company Accounting Oversight Board's Auditing Standard No. 5 as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***Based upon this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018.***

62.     The statements identified in Paragraph 61 were materially false and misleading when made because with actual knowledge that ineffective internal controls over financial reporting, themselves, could cause Paysign's stock price to decline, Defendants knowingly or recklessly disregarded that material weaknesses in the Company's internal controls over financial reporting already existed because they (a) knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, (b) knew or recklessly disregarded that the Company's revenue and cashflow figures were inaccurate and the Company's general ledger entries contained errors during the Class Period, and (c) knew or recklessly disregarded that software changes made by Defendant Spence caused inaccurate balances to be reported on cardholder accounts.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

63.     Attached as exhibits to the 2018 10-K were signed certifications of Defendants Newcomer and Attinger pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").   In particular, Newcomer and Attinger certified that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

64.     On May 8, 2019, Paysign filed a Quarterly Report on Form 10-Q with the SEC, that reported the Company's financial and operating results for the quarter that ended on March 31, 2019 (the "1Q19 10-Q").   The 1Q19 10-Q contained the following materially false and misleading statements regarding the effectiveness of the Company's internal controls over financial reporting:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***

65.     The statements identified in Paragraph 64 were materially false and misleading when made because with actual knowledge that ineffective internal controls over financial reporting, themselves, could cause Paysign's stock price to decline, Defendants knowingly or recklessly disregarded that material weaknesses in the Company's internal controls over financial reporting already existed because they (a) knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, (b) knew or recklessly disregarded that Paysign's revenue and cashflow figures were inaccurate and the Company's general ledger entries contained errors during the Class Period, and (c) knew or recklessly disregarded that software changes made by Defendant Spence caused inaccurate balances to be reported on cardholder accounts.

66.     Attached as exhibits to the 1Q19 10-Q were signed certifications of Defendants Newcomer and Attinger pursuant to SOX, which certified that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

67.     On August 7, 2019, Paysign filed a Quarterly Report on Form 10-Q with the SEC that reported the Company's financial and operating results for the quarter that ended on June 30, 2019 (the "2Q19 10-Q").  The 2Q19 10-Q contained the following materially false and misleading statements regarding the effectiveness of the Company's internal controls over financial reporting:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure

22

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***

68. The statements identified in Paragraph 67 were materially false and misleading when made because with actual knowledge that ineffective internal controls over financial reporting, themselves, could cause Paysign's stock price to decline, Defendants knowingly or recklessly disregarded that material weaknesses in the Company's internal controls over financial reporting already existed because they (a) knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, (b) knew or recklessly disregarded that Paysign's revenue and cashflow figures were inaccurate and the Company's general ledger entries contained errors during the Class Period, and (c) knew or recklessly disregarded that software changes made by Defendant Spence caused inaccurate balances to be reported on cardholder accounts.

69. Attached as exhibits to the 2Q19 10-Q were signed certifications of Defendants Newcomer and Attinger pursuant to SOX, which certified that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under

23

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

[their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

70.     On November 6, 2019, Paysign filed a Quarterly Report on Form 10-Q with the SEC that reported the Company's financial and operating results for the quarter that ended on September 30, 2019 (the "3Q19 10-Q").  The 3Q19 10-Q contained the following materially false and misleading statements regarding the effectiveness of the Company's internal controls over financial reporting:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of September 30, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***

71.     The statements identified in Paragraph 70 were materially false and misleading when made because with actual knowledge that ineffective internal controls over financial reporting, themselves, could cause Paysign's stock price to decline Defendants knowingly or recklessly disregarded that material weaknesses in the Company's internal controls over financial reporting already existed because they (a) knowingly or recklessly employed an accountant

24

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

prohibited from practicing before the SEC to prepare the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, (b) knew or recklessly disregarded that Paysign's revenue and cashflow figures were inaccurate and the Company's general ledger entries contained errors, and (c) knew or recklessly disregarded that software changes made by Defendant Spence led to inaccurate balances reported for cardholder accounts.

72.     Attached as exhibits to the 3Q19 10-Q were signed certifications of Defendants Newcomer and Attinger pursuant to SOX, which certified that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

**Newcomer's and Spence's Stock Sales During the Class Period**

73.     During the Class Period, Defendants Newcomer and Spence took advantage of Paysign's artificially inflated stock price and collectively earned over $3.5 million from sales of Paysign common stock.  The charts below show the amount of shares sold by Newcomer and Spence and the net proceeds these Defendants reaped during the Class Period:

**Newcomer's Class Period Stock Sales:[5]**

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 9/16/2019 | 200,000 | $11.0300 | $2,206,000 |
| **Total** | **200,000** | | **$2,206,000** |

**Spence's Class Period Stock Sales:**

---

[5] Excluded from these charts are proceeds from shares withheld by Defendants in order to cover tax withholding obligations.

25

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| Date | Shares Disposed | Price | Proceeds |
|------|-----------------|-------|----------|
| 9/23/2019 | 20,681 | $11.0100 | $227,698 |
| 9/24/2019 | 3,100 | $11.0200 | $34,162 |
| 10/2/2019 | 1,600 | $11.0000 | $17,600 |
| 10/3/2019 | 49,981 | $11.0200 | $550,791 |
| 10/4/2019 | 44,638 | $11.4000 | $508,873 |
| **Total** | **120,000** | | **$1,339,124** |

74.     The stock sales above were dramatically out of line with Newcomer's and Spence's prior trading activity before the Class Period in terms of both the total number of shares sold and the amount of proceeds reaped from the any sale of Paysign's artificially inflated stock price. In fact, Newcomer and Spence did not sell any stock in the twelve-month period before the Class Period began.

**The Truth Begins to Emerge**

75.     On March 16, 2020, Paysign announced that the Company would be unable to file its Annual Report on Form 10-K for the fiscal year that ended on December 31, 2019.  The Company claimed that "in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with [SOX] 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls."

76.     Just as Defendants had predicted, their disclosure of ineffective internal controls over financial reporting caused Paysign's stock price to decline. On this news, the price of Paysign's common stock declined by nearly 17% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020, on unusually heavy trading volume.  The

price of Paysign's common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020.

77.     On March 31, 2020, Paysign released a press release, announcing that the Company would again postpone its earnings results call scheduled for that same day "to complete its year-end closing procedures."

78.     On this news, the price of Paysign's common stock declined by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020.  The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share.

79.     On April 3, 2020, Paysign filed an Annual Report on Form 10-K with the SEC for the fiscal year that ended on December 31, 2019 (the "2019 10-K").  The 2019 10-K contained a section entitled "Controls and Procedures."   A subsection entitled "Auditor Opinion on the Internal Control Over Financial Reporting" within the section on "Controls and Procedures" concluded that:

> Inadequate and ineffective management assessment of internal control over financial reporting, and ineffective design, implementation and monitoring of information technology general controls pertaining to privileged user accounts and the Company's change management to financial applications.  ***Additionally, the Company lacked sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018 and 2019***.

(Emphasis added).

80.     In another section entitled "Management's Report on Internal Controls over Financial Reporting and Remediation Initiatives," Paysign and the Individual Defendants admitted that:

> [M]anagement concluded that our internal control over financial reporting was not effective. Material weaknesses included the management assessment of internal

27

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

control over financial reporting, and ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management. During quarter 4 of 2019 and continuing in 2020, management has taken steps to i) improve the design and methods for testing internal controls, ii) added resources to carry out such practices, and iii) instituted new procedures for managing system user access and change control. Additionally, a third material weakness cited by the auditors was that the Company lacked sufficient monitoring and disclosure controls when employing a part-time employee. The Company believes that it had sufficient monitoring and disclosure controls in place and received an opinion of counsel concluding that such work did not constitute a compliance failure. In any event, this situation has already been resolved by the individual no longer being employed by the Company.

81.     On April 6, 2020, Defendants Newcomer and Attinger attended a conference call to announce and discuss Paysign's financial results for the fourth quarter of 2019. On this conference call, Newcomer told analysts that the delay in filing the 2019 10-K was due to "several rounds of auditor request[s] for additional data, which took several days to complete." Attinger provided further details about the delay, and informed analysts that Paysign and its auditors identified material weaknesses in its internal controls over financial reporting, including a lack of appropriate separation of responsibilities, inadequate documentation and additional deficiencies related to "systems user access and change control."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of all persons or entities that purchased or otherwise acquired the Company's common stock during the period from March 12, 2019 and March 31, 2020, both dates inclusive.  Excluded from the Class are Defendants, officers and directors of the Company, any entity in which the Defendants have or had a controlling interest; and affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

83.     The Class is so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on a national exchange.

Plaintiffs believe that there are thousands of members in the proposed Class, with the overwhelming majority of Class members having held shares in a street name.  Potential Class members may be identified from records maintained by the Company, its transfer agents, and brokers and banks that hold shares beneficially for investors in a street name, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.    Plaintiffs' claims are typical of the claims of those of the Class, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

85.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

86.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the Company and the Individual Defendants made false statements or failed to disclose material information that rendered their Class Period statements as misleading;

- whether the Individual Defendants are control persons of the Company for purposes of Section 20(a) of the Exchange Act;

- whether the Company and the Individual Defendants made the misrepresentations or omissions with scienter;

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' misconduct complained of herein; and

- whether the Class has sustained damages with respect to its Exchange Act claims and, if so, what is the proper measure of damages.

87.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

88.    The presumption of reliance established by the fraud-on-the-market doctrine applies in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's common stock traded in an efficient market;

- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and other Class members purchased or otherwise acquired the Company's common stock between the time that the Defendants failed to disclose or misrepresented material facts, and the time that the true facts were disclosed or materialized, without knowledge of the omitted or misrepresented facts.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

89.     Based upon the foregoing, Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market if they did not actually rely on Defendants' materially false or misleading statements.

90.     Alternatively, Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in violation of a duty to disclose such information, as detailed above.

<u>**COUNT I**</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

91.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 to 90 as if fully set forth herein.

92.     This Count is asserted against the Company and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

93.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

the Company's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's common stock at artificially inflated prices.

94.     Specifically, the Company and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 55 to 72.

95.     The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Company and the Individual Defendants.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs that were inconsistent with their public statements.

96.     As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding the Company's business, operations, and finances.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of the Company's common stock was artificially inflated throughout the Class Period.

97.     Additionally, as sellers of Paysign common stock during the Class Period, Defendants Newcomer and Spence had a duty to disclose or refrain from trading on Paysign's artificially inflated stock price.

98.     In ignorance of the adverse facts concerning the Company's business, operations and finances, which were concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock or upon statements disseminated by Defendants and were damaged thereby.

99.     During the Class Period, the Company's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid.  At the time of the purchases or acquisitions by Plaintiffs and the Class, the true value of the Company's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of the Company's common stock declined sharply upon public disclosure of the facts or materialization of the risks alleged herein to the injury of Plaintiffs and other Class members.

100.   By reason of the conduct alleged herein, the Company and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of the Company's common stock to decline.  The Company and the Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

102.   Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 to 101 above, as if fully set forth herein.

103.   During the Class Period, Newcomer, Attinger and Spence participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information that rendered the Company's public statements false and misleading.

104.   As officers and directors of a publicly owned company, Newcomer, Attinger and Spence had a duty to disseminate accurate and truthful information with respect to the Company's financial information and results of operations, and to correct promptly any public statements issued by the Company, which had become materially false or misleading.

105.    Because of their positions of control and authority as senior officers, Newcomer, Attinger and Spence were able to, and did, control the Company's statements, which were disseminated in the marketplace during the Class Period concerning its financial information and business.  In addition, Newcomer and Spence are controlling persons of the Company because of their combined ownership of 36.3% of the outstanding shares of the Company's common stock.

106.    Throughout the Class Period, Newcomer, Attinger and Spence exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Newcomer, Attinger and Spence, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

107.    Newcomer, Attinger and Spence therefore, acted as controlling persons of the Company.  By reason of their senior management positions and/or being directors of the Company, Newcomer, Attinger and Spence had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Newcomer, Attinger and Spence exercised control over the general operations of the Company and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs and the other members of the Class, complain.

108.    As control persons, Newcomer, Attinger and Spence are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  January 12, 2020

Respectfully submitted,

*/s/ Omar Jafri*

**POMERANTZ LLP**

Patrick V. Dahlstrom
Omar Jafri
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com
ojafri@pomlaw.com

*-and-*

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

**MUEHLBAUER LAW OFFICE, LTD.**

ANDREW R. MUEHLBAUER, ESQ.

36
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
            sean@mlolegal.com

**LEVERTY & ASSOCIATES LAW CHTD.**

Patrick R. Leverty
832 Willow Street
Reno, Nevada 89502
Telephone: 775-624-5276
Email: pat@levertylaw.com

*Attorneys for Plaintiffs*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT