# EXHIBIT B

Order Imposing Findings in re:
SEC Administrative Proceeding File No. 3-16339

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

SECURITIES ACT OF 1933
Release No. 9917 / September 18, 2015

SECURITIES EXCHANGE ACT OF 1934
Release No. 75947 / September 18, 2015

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3699 / September 18, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16339

| | |
|---|---|
| **In the Matter of**<br><br>   **JOHN BRINER, ESQ.,**<br>   **DIANE DALMY, ESQ.,**<br>   **DE JOYA GRIFFITH, LLC,**<br>   **ARTHUR DE JOYA, CPA,**<br>   **JASON GRIFFITH, CPA,**<br>   **CHRIS WHETMAN, CPA,**<br>   **PHILIP ZHANG, CPA,**<br>   **M&K CPAS, PLLC,**<br>   **MATT MANIS, CPA,**<br>   **JON RIDENOUR, CPA, and**<br>   **BEN ORTEGO, CPA,**<br><br>**Respondents.** | **ORDER MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE AS TO DE JOYA GRIFFITH, LLC, ARTHUR DE JOYA, CPA, JASON GRIFFITH, CPA, AND PHILIP ZHANG, CPA** |

**I.**

On January 15, 2015, the Securities and Exchange Commission ("Commission") deeming it appropriate, instituted public administrative and cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 4C and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 102(e) of the Commission's Rules of Practice against De Joya Griffith, LLC ("De Joya"), Arthur De Joya, CPA, Jason Griffith, CPA ("Griffith"), and Philip Zhang, CPA ("Zhang") (together, "Respondents").

## II.

Respondents have submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order, as set forth below.

## III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

### RESPONDENTS

1.      **De Joya** is a registered public accounting firm based in Henderson, Nevada.  De Joya issued audit reports for nine issuers, as further described below.  For all relevant times, Arthur De Joya, Griffith, and Zhang were partners of De Joya.

2.      **Arthur De Joya**, 48, of Las Vegas, Nevada, is a CPA licensed in the state of Nevada, a partner of De Joya, and has served as a managing partner of De Joya.

3.      **Griffith**, 37, of Las Vegas, Nevada, is a CPA licensed in the state of Nevada, a partner of De Joya, and was a managing partner of De Joya.

4.      **Zhang**, 40, of Las Vegas, Nevada, is a CPA licensed in the state of Nevada and was a partner of De Joya.

### RELEVANT ENTITIES AND INDIVIDUALS

5.      **John Briner** ("Briner"), 35, is an attorney and a Canadian citizen who resides in Vancouver, British Columbia.  Briner's law firm was MetroWest Law Corporation ("MetroWest"). Briner also controlled Jervis Explorations Inc. ("Jervis"), a British Columbia corporation.  In 2010, to resolve a Commission action against him alleging a pump-and-dump and market manipulation scheme, Briner consented to the entry of a federal court judgment that enjoined him from violating the antifraud and securities registration provisions of the federal securities laws; barred him for five years from participating in penny stock offerings; and ordered him to disgorge ill-gotten gains of $52,488.32 plus prejudgment interest and pay a civil penalty of $25,000.  SEC v. Golden Apple Oil and Gas, Inc., et al., 09-Civ-7580 (S.D.N.Y.) (HB).  The Commission subsequently suspended Briner from appearing or practicing before it as an attorney, with a right to apply for reinstatement after five years.  John Briner, Exchange Act Release No. 63371, 2010 WL 4783445 (Nov. 24, 2010).

6.      **Diane Dalmy** ("Dalmy"), 58, is an attorney who resides in Denver, Colorado and is

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

admitted to practice law in Colorado.  Dalmy issued opinion letters for the issuers identified below.

7.      **Jervis** is a British Columbia corporation whose sole director is John Briner.  Jervis purportedly sold certain British Columbia mineral claims to each of the issuers, further described below.

8.      **La Paz Mining Corp.** ("La Paz") is a Nevada corporation organized in November 2011.  On July 19, 2012, La Paz filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $20,000 public offering.  On September 25, 2012, La Paz filed an amendment to its Form S-1 registration statement.  La Paz's registration statement states that it has its principal offices in Peoria, Arizona.

9.      **Tuba City Gold Corp.** ("Tuba City") is a Nevada corporation organized in June 2012.  On January 2, 2013, Tuba City filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $12,000 public offering.  Its Form S-1 states that it has its principal offices in Dundas, Ontario, Canada.

10.     **Braxton Resources Inc.** ("Braxton") is a Nevada corporation organized in May 2012.  On January 2, 2013, Braxton filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $24,000 public offering.  Its Form S-1 states that it has its principal offices in Peoria, Arizona.

11.     **Clearpoint Resources Inc.** ("Clearpoint") is a Nevada corporation organized in May 2012.  On January 2, 2013, Clearpoint filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $16,000 public offering.  Its Form S-1 states that it has its principal offices in Peoria, Arizona.

12.     **Gold Camp Explorations Inc.** ("Goldcamp") is a Nevada corporation organized in June 2012.  On January 2, 2013, Goldcamp filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $10,000 public offering.  Its Form S-1 states that it has its principal offices in St. Alberta, Alberta, Canada.

13.     **Gaspard Mining Inc.** ("Gaspard") is a Nevada corporation organized in May 2012.  On January 25, 2013, Gaspard filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $20,000 public offering.  Its Form S-1 states that it has its principal offices in Ocala, Florida.

14.     **Coronation Mining Corp.** ("Coronation") is a Nevada corporation organized in May 2012.  On January 25, 2013, Coronation filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $30,000 public offering.  Its Form S-1 states that it has its principal offices in Ocala, Florida.

15.     **Jewel Explorations Inc.** ("Jewel") is a Nevada corporation organized in May 2012.  On January 25, 2013, Jewel filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $20,000 public offering.  Its Form S-1 states that it has its principal offices in Winnipeg, Manitoba, Canada.

3

16.    **Canyon Minerals Inc.** ("Canyon") is a Nevada corporation organized in May 2012.  On January 25, 2013, Canyon filed a Form S-1 registration statement with the Commission seeking to register management's common shares for resale in a $24,000 public offering.  Its Form S-1 states that it has its principal offices in Salt Lake City, Utah.

## RESPONDENTS CONDUCTED MATERIALLY DEFICIENT AUDITS

### Background

17.    Beginning in or about November 2011, Briner contacted De Joya to conduct audits of nine issuers' financial statements that were to be included in Form S-1 registration statements. Zhang was the engagement partner for audits of Tuba City, Braxton, Clearpoint, Goldcamp, Gaspard, Coronation, Jewel, and Canyon (collectively, the "Issuers").  Arthur De Joya was the engagement quality review partner for audits of Clearpoint and Gaspard.  Griffith (together with Zhang and Arthur De Joya, the "De Joya Partners") was the engagement quality review partner for audits of La Paz, Tuba City, Braxton, Goldcamp, Coronation, Jewel, and Canyon.

18.    The De Joya Partners knew that Briner did the accounting and created the financial statements to be used in the Form S-1 registration statements for each of the Issuers.  The De Joya Partners also knew that Briner maintained all of the Issuers' purported funds "in trust" in an account Briner controlled (the "Master Trust Account").

19.    Briner and his assistant were the exclusive contacts between De Joya and each Issuer's officer.  The De Joya Partners did not directly communicate with any of the Issuers' sole officers.  The De Joya Partners knew that Briner provided all of the information concerning the Issuers and all of the supporting evidence for their audits.

20.    The Issuers two largest transactions consisted of the officer's purchase of Issuer stock for $30,000 and the Issuer's purchase of British Columbia mineral claims for between $7,500 and $8,500 from Jervis.

21.    Zhang conducted the Issuers' audits, including auditing the above transactions, and consented to the inclusion of De Joya's audit report in each of the Issuers' Form S-1 registration statements filed with the Commission.  De Joya was paid a total of $37,500 in fees for the audits, including the fee for auditing of La Paz.  Each audit report stated that "[w]e conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that the financial statements present the Issuers' financial position "in conformity with U.S. generally accepted accounting principles."  As described below, the audit was so deficient that it amounted to no audit at all, and the De Joya Partners ignored red flags.

### Respondents Failed to Detect Red Flags in Accepting and Continuing with the Issuers as Clients

22.    Under PCAOB standard QC Section 20 (System of Quality Control for a CPA Firm's Accounting and Auditing Practice) ("QC 20"), "[p]olicies and procedures should be established for deciding whether to accept or continue a client relationship" and "[s]uch policies and procedures should provide the firm with reasonable assurance that the likelihood of association

4

with a client whose management lacks integrity is minimized" (at .14). [2]

23.     Under PCAOB Auditing Standard No. 12 (Identifying and Assessing Risks of Material Misstatement) ("AS 12"), auditors should "evaluate whether information obtained from the client acceptance and retention evaluation process or audit planning activities is relevant to identifying risks of material misstatement" (¶ 41).

24.     Additionally, under PCAOB Auditing Standard No. 7 (Engagement Quality Review) ("AS 7"), among other things, engagement quality review partners, should "evaluate the significant judgments made by the engagement team," (¶ 9) including "consideration of the firm's recent engagement experience with the company and risks identified in connection with the firm's client acceptance and retention process" (¶ 10 a.).

25.     Finally, auditors must meet PCAOB standard AU Section 230 (Due Professional Care in the Performance of Work) ("AU 230"), which requires that auditors "exercise professional skepticism" (at .07), "consider the competency and sufficiency of the evidence" (at .08), and "neither assume[] that management is dishonest nor assume[] unquestioned honesty" (at .09).

26.     De Joya's client acceptance policies and procedures in effect at the time it accepted the Issuers as clients required very little.  De Joya's policy instructed its staff to "confirm individuals" and, if there was something to report, to "summarize findings, site [sic] sources, and email Partner."  In practice, such check consisted of a simple Internet search.

27.     Zhang failed to sufficiently question or otherwise investigate the Issuers' management, which would have revealed Briner's undisclosed role as a control person.  Nor did he conduct a background check of Briner or Dalmy, which at minimum would have turned up, among other things, the Commission's complaint alleging fraud and suspension order against Briner, and that Briner had been on the OTC Market's Prohibited Attorney List since March 15, 2006, and that Dalmy had also been on the list since September 25, 2009.

28.     Additionally, De Joya's client acceptance policies and procedures failed to detect clues that should have raised concerns.  Upon referring the Issuers, Briner's assistant provided De Joya with the names of the officers, the inception dates, and the year-end dates for each of the Issuers.  From this, De Joya was on notice that two of the officers controlled four Issuers.  De Joya was also on notice that seven of the nine Issuers were incorporated on the same day or within one day of each other (May 31, 2012 or June 1, 2012).

29.     This information should have at least caused De Joya and Zhang to question why the Issuers' dates of incorporation appeared to be coordinated.  Zhang failed to ask any questions with respect to this information.

30.     For the above reasons, De Joya's client acceptance policies and procedures failed to meet QC 20 and, in the course of utilizing these procedures during the engagements at issue, Zhang failed to meet AS 12 and AU 230, and Griffith and Arthur De Joya failed to meet AS 7.

---

[2] The PCAOB standards referenced herein are the standards that were in effect during the time of relevant conduct.

5

**Zhang Failed to Obtain an Understanding of the Issuers**

31. Under AS 12, auditors should "obtain an understanding of the company and its environment . . . to understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement," including "[t]he nature of the company" (¶ 7.b.) and "[t]he company's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement" (¶ 7.d.). Further, obtaining an understanding of the nature of the company includes understanding "[t]he company's organizational structure and management personnel; [t]he sources of funding of the company's operations and investment activities, including the company's capital structure[, t]he company's operating characteristics, including its size and complexity" (¶ 10), and "an understanding of internal control includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented" (¶ 20).

32. Additionally, auditors must meet AU 230, which requires that auditors "exercise professional skepticism" (at .07) and "should be knowledgeable about the client" and are responsible for the "supervision of[] members of the engagement team" (.06).

33. Zhang failed to obtain a sufficient understanding of the Issuers. What little understanding of the Issuers he obtained came almost entirely from draft Form S-1 registration statements and responses to certain questionnaires from the Issuers, both provided by Briner. Zhang did not obtain an understanding of the Issuers through direct communication with the Issuers' officers.

34. In obtaining an understanding of the Issuers, Zhang did not question the substantial similarities among the Issuers. The Issuers filed eight nearly identical Form S-1 registration statements. Using almost exactly the same language, each stated the following: (1) the Issuers are not blank check companies; (2) the Issuers' officers purchased Issuer stock for $30,000; (2) the Issuers purchased British Columbia mineral claims from Jervis; (3) Jervis supplied nearly all the Issuers' with their business plans; (4) the officers "solely" control the company; (5) the officers planned to devote only 4 to 5 hours each week to the business; and (6) the officers have not inspected the land comprising the mineral claims.

35. Within about a four-week period, Zhang read eight of these registration statements. Despite this, Zhang did not raise any concern about the similarities among the registration statements, or perform any enhanced procedures to respond to the level of risk presented.

36. For the above reasons, Zhang failed to meet AS 12 and AU 230.

**The De Joya Partners Failed to Adequately Respond to Concerns that Briner and Dalmy May Have Been Engaging in Fraud**

37. In early November 2012, while Zhang was conducting the initial audit for the Issuers, a De Joya staff member raised concerns to the De Joya Partners, including Griffith and Arthur De Joya, that Briner and Dalmy may be engaging in fraud with respect to the Issuers.

38. Under QC 20, "policies and procedures should provide the firm with reasonable assurance that the likelihood of association with a client whose management lacks integrity is

6

minimized" (at .14) and that the firm "[a]ppropriately considers the risks associated with providing professional services in the particular circumstances" (at .15 b.).

39.    Under AS 12, "[t]he auditor's assessment of the risks of material misstatement, including fraud risks, should continue throughout the audit.  When the auditor obtains audit evidence during the course of the audit that contradicts the audit evidence on which the auditor originally based his or her risk assessment, the auditor should revise the risk assessment and modify planned audit procedures or perform additional procedures in response to the revised risk assessments" (¶ 74).

40.    Further, under PCAOB Auditing Standard No. 13 (The Auditor's Responses to the Risks of Material Misstatement) ("AS 13"), "[t]he auditor's responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence [including] . . . modifying the planned audit procedures to obtain more reliable evidence regarding relevant assertions and (b) obtaining sufficient appropriate evidence to corroborate management's explanations or representations concerning important matters, such as through third-party confirmation, use of a specialist engaged or employed by the auditor, or examination of documentation from independent sources" (¶ 7).

41.    Finally, under AS 7, the engagement quality review partner should "evaluate the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement," (¶ 9) including "significant risks identified by the engagement team, including fraud risks" (¶ 10.b.).

42.    De Joya and Zhang failed to (a) properly consider the risks associated with the Issuers' audits, (b) apply professional skepticism in evaluating audit evidence indicating Briner and Dalmy may be engaging in fraud, (c) re-evaluate their risk assessments for the Issuers' audits in light of such evidence, and (d) regarding Arthur De Joya's and Griffith's roles as engagement quality review partners, appropriately evaluate the engagement teams' judgments to continue with the audits without appropriately re-assessing and responding to the risk of fraud in violation of QC 20, AS 12, AS 13, and AS 7.

43.    On or about November 5, 2012, a De Joya staff member became concerned that Briner might be engaging in fraud in connection with the De Joya Issuers.  Her concern stemmed from conversations she had with certain Issuers' officers in which nearly all her questions about the Issuers were deferred to Briner.  These conversations caused her to conduct an internet search on Briner.  She found, among other things, the Commission's complaint against him.  Additional searches yielded news articles describing Briner and Dalmy as repeat securities fraud offenders.

44.    As a result, the De Joya staff member sent four emails over three days sharing the negative information she found concerning Briner and Dalmy.  First, on November 5, 2012, she sent Zhang and another De Joya partner, who was reviewing an interim financial statement for La Paz, an email containing links to the Commission's complaint against Briner (SEC v. Golden Apple Oil and Gas, Inc., et al., 09-Civ-7580 (S.D.N.Y.) (HB)) and a Canadian news article stating, among other things, that the British Columbia Securities Commission issued an order (reciprocal to the Commission's order suspending Briner) banning Briner from trading shares in British

Columbia or "acting in a management or consultative capacity in any securities related matter."[3] In the email, she asked Zhang and the other De Joya partner to "review the links" and stated that she "will call [Zhang] tonight."

45.     Second, that same day, the De Joya staff member sent another email to Zhang and the other De Joya partner with a link to an article posted on Pumpsanddumps.com stating that Briner and Dalmy "together and apart, the pair has been involved in dozens of schemes on the Vancouver market as well as the Pink sheets and OTC Bulletin Board, writing many a dubious legal opinion resulting in millions of dollars lost by thousands of investors."[4]

46.     Third, on November 7, 2012, the De Joya staff member sent yet another email to Zhang and the other De Joya partner attaching an article about a De Joya client, MoneyMinding International Corp., and its counsel, Dalmy, who was described as having "a reputation for helping scoundrel promoters take dubious companies public on the U.S. over-the-counter markets."  The article also specifically mentions De Joya as having "similarly helped many dubious companies go public on the bulletin board."[5]

47.     Finally, the same day, the De Joya staff member forwarded the email and article to Griffith stating, "I thought I should forward this to you as well.  I was doing research on Diane Dalmy and John Briner as we are working on some of their jobs and that's how I can [sic] across this article."  Griffith then forwarded her email with the attached article to Arthur De Joya without comment.

48.     In light of the negative background the De Joya staff member found and the officers' apparent inability to answer questions about the issuers, the staff member found it suspicious that Briner and Dalmy were working together on eight of the nine issuers that De Joya was auditing.  The staff member discussed her concerns with Zhang.  Zhang then discussed the staff member's concerns with the other De Joya partner and resolved that Zhang would raise them with Griffith and Arthur De Joya, which Zhang did.

49.     Zhang opened the links in the emails the De Joya staff member sent, printed the documents, highlighted relevant portions, and brought them to separate face-to-face meetings with Arthur De Joya and Griffith.  At these meetings it was collectively decided that De Joya could continue with the engagements because Briner was not appearing before the Commission in violation of his suspension.

50.     Zhang and Arthur De Joya each informed the De Joya staff member of this decision and then continued with the audits without adjusting any audit procedures or taking any additional precautions in light of the facts they learned about Briner and Dalmy.  Zhang ultimately signed

---

[3] http://www.canadianjusticereviewboard.ca/article-securities%20lawyer.htm

[4] http://www.pumpsanddumps.com/2011/06/all-that-glitters-is-not-greenwood-gold.html

[5] http://blogs.vancouversun.com/2011/03/17/david-baines-two-victoria-startups-wade-into-bulletin-board-swamp/

audit reports containing unqualified opinions for the Issuers and Arthur De Joya and Griffith signed off on the Issuers' audits as Engagement Quality Review partners without taking any further action.

51.     None of the above purported discussions were documented in any workpaper, or otherwise, in violation of PCAOB Auditing Standard No. 3 (Audit Documentation) ("AS 3"), which provides that auditors "must document significant findings or issues, actions taken to address them (including additional evidence obtained), and the basis for the conclusions reached in connection with each engagement" (¶ 12).

### Zhang Failed to Properly Audit the Issuers' Cash

52.     Under PCAOB standard AU Section 330 (The Confirmation Process) ("AU 330"), when "information about the respondent's [i.e., the person or entity from which a confirmation is requested] competence, knowledge, motivation, ability, or willingness to respond, or about the respondent's objectivity and freedom from bias with respect to the audited entity comes to the auditor's attention, the auditor should consider the effects of such information on designing the confirmation request and evaluating the results" and, in circumstances where "the respondent is the custodian of a material amount of the audited entity's assets," the auditor should exercise "a heightened degree of professional skepticism" and "should consider whether there is sufficient basis for concluding that the confirmation request is being sent to a respondent from whom the auditor can expect the response will provide meaningful and appropriate audit evidence" (at .27).

53.     Additionally, under PCAOB Auditing Standard No. 15 (Audit Evidence) ("AS 15"), "[t]he auditor must plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion" (¶ 4).  To be appropriate, audit evidence must be both relevant and reliable in providing support for the conclusions on which the auditor's opinion is based.  "The reliability of evidence depends on the nature and source of the evidence and the circumstances under which it is obtained" (¶ 8).  Under AS 13, "[t]he auditor's responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence" (¶ 7).

54.     Zhang exhibited no concern about Briner's handling of the Issuers' alleged cash. Zhang knew that Briner held all of the Issuers' purported funds in the Master Trust Account and that none of the Issuers had their own bank account.  Zhang also knew that Briner was a "consultant" to the Issuers and that MetroWest was a law firm.  Zhang did not seek any appropriate audit evidence about what, if any, limitations governed Briner's use of the cash in his Master Trust Account.  Nor did he ask for a reconciliation between Briner's Master Trust Account and the schedules Briner provided purportedly showing how much cash in his account was attributable to each Issuer.

55.     In addition, Zhang violated the above standards by failing to apply professional skepticism in gathering and evaluating the evidence obtained, such as Briner's confirmation of Issuer cash, and consider Briner's "objectivity and freedom from bias with respect to the audited entity" in relation to the Issuers' cash confirmation Briner provided.

9

**Zhang Disregarded Red Flags that Briner's Services to
the Issuers Were Not Given Accounting Recognition**

56.     Under PCAOB standard AU Section 334 (Related Parties) ("AU 334"), transactions that are indicative of the existence of related parties include, among other things, "transactions [that] are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge" (at .08(f)).  Further, under AS 15, "[i]f audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit" (¶ 29).  Finally, auditors must exercise professional skepticism throughout the course of the engagement consistent with standard AU 230.

57.     Zhang failed to question Briner's fee arrangement with the Issuers.  Instead, he relied on legal confirmation letters from Briner that conflicted on their face with what he knew to be true about the services Briner provided.

58.     These letters each stated that "[a]s of the date of inception and up to the present date, the [Issuers were] not indebted to us for services and expenses (billed or unbilled) of which we are aware."  Zhang knew that Briner provided substantial services to the Issuers, such as, among other things, performing accounting functions (paying expenses and recording transactions), drafting the Issuers' registration statements, and preparing the Issuers' financial statements for their registration statements.  Zhang also knew that the Issuers' financial statements and general ledgers did not reflect payment for Briner's services.  Despite this, Zhang did not ask Briner for any invoices, agreements, engagement letters, or any details about his fee arrangements with the Issuers.  Nor did he conduct any related party analysis.

59.     For the above reasons, Zhang failed to meet AU 334, AS 15, and AU 230.

**Zhang Disregarded Red Flags that the Issuers'
Stock Sales to Their Officers Were Shams**

60.     Under AS 15, "[i]f audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit" (¶ 29 ).  Under AS 12, the auditor should obtain "an understanding of the nature of the company include[ing]…the sources of funding of the company's operations" (¶ 10)  and "[w]hen the auditor obtains audit evidence during the course of the audit that contradicts the audit evidence on which the auditor originally based his or her risk assessment, the auditor should revise the risk assessment and modify planned audit procedures or perform additional procedures in response to the revised risk assessments" (¶ 74).  Further, under AS 14, auditors should consider "[t]he sufficiency and appropriateness of the audit evidence obtained" (¶ 4.f.).  In meeting these standards, auditors must apply professional skepticism and due care consistent with AU 230.

61.      Briner provided De Joya with schedules for each of the Issuers that purportedly listed all of the Issuer's transactions (prepared by Briner allegedly reflecting cash attributable to

10

each Issuer from his Master Trust Account). Each appeared to indicate that individuals or entities named "Hyperion" management, "Luke Pretty," or "Dhaliwal" supplied the funds to pay for the officers' stock purchases. As such, these schedules contradicted the Stock Purchase Agreements, which all indicated that the officer purchased the Issuer's stock.

62.    For some Issuers, the date listed for the stock purchase was prior to the Issuers' incorporation.

63.    For others, the date listed for the stock purchase was after the Issuers purchased their mineral claims, which, if true, raises questions as to how the Issuers were able to finance a mineral claim purchase before having received the funds necessary to make the mineral claim purchase.

64.    Despite the contradicting evidence regarding who paid for (and owned) the Issuers' stock, and when the transactions took place, Zhang took no further action with respect to these alleged stock purchases.

65.    Although Zhang and De Joya staff questioned Briner about who paid for the stock purchase, they failed to obtain adequate supporting evidence that resolved this issue. In or about October 2012, De Joya staff requested supporting documentation and a breakdown by Issuer identifying who paid for the stock. Briner replied that the officers borrowed the funds, not only for the stock purchase, but also for the Issuers' mineral claim purchase from Jervis as well. As support, Briner sent copies of three checks: (1) $300,000 from Jagjit Dhaliwal to MetroWest, (2) $42,500 from MetroWest to Jervis, and (3) $41,543.75 from an unidentified individual or entity to Jervis. Briner also stated that the $300,000 was really from an entity called Global Investments (not Dhaliwal), which purportedly loaned the funds to the officers to incorporate and pay for company stock.

66.    As Briner's response did not make clear who paid for the stock, the De Joya staff continued to request a breakdown by Issuer of who paid for the stock purchases (and also for the mineral claims). The breakdown Briner provided stated that an individual referred to as Luke Pretty paid $15,000 for the mineral claims allegedly purchased by Goldcamp and Tuba City. And that Luke Pretty paid $60,000 for Goldcamp's and Tuba City's officers' purchase of company stock. Global Investments paid the remaining funds to the Issuers.

67.    Not satisfied with Briner's response, on November 27, 2012, Zhang emailed Briner asking who paid Jervis for the mineral claims stating "we have received contradicting information for this" and that if it was Global Investments "why [is it] not shown in [the] books." He also asked about Luke Pretty. But Briner did not provide any additional supporting documentation. Nor did Zhang seek clarification from the Issuers' officers.

68.    As a result, Zhang failed to resolve these conflicts or obtain sufficient appropriate audit evidence to support De Joya's opinions and therefore violated PCAOB standards AS 15, AS 12, and AU 230.

11

**Zhang Disregarded Red Flags that the Issuers'**
**Mineral Claim Purchases Were Shams**

69.     Zhang failed to investigate evidence from Briner that should have caused him to question the Issuers' alleged mineral claim purchases from Jervis.

70.     During the audits, Zhang sought information about Briner's relationship with Jervis, in part because all of the Issuers purchased their mineral claims from Jervis.  On or about October 25, 2012, Zhang participated in a conference call with Briner to discuss the issue. Following the call, Briner provided a letter dated October 26, 2012 stating that he "is only a director of Jervis Explorations Inc. [and a]s such he neither holds any ownership interests in that company nor is he involved in any decision making process of Jervis Explorations Inc."  Learning that Briner was a director of Jervis and knowing that Briner played a substantial role in the Issuers' affairs should have caused Zhang to obtain evidence to corroborate Briner's assertions regarding the Issuers' mineral claim purchases from Jervis.

71.     Zhang, therefore, violated AU 334 (because Briner appeared to control Jervis and Zhang failed to, among other things, "review the extent and nature of business transacted with [Jervis] for indications of previously undisclosed relationships" (.08(e))) and AS 13, which states that "[t]he auditor's responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence."  (¶ 7)  Zhang also violated AS 15, AS 12, and AU 230 for failing to resolve the conflict between Briner's role as a director of Jervis and his statement that he is not involved in Jervis's decision making.

**Zhang Failed to Resolve Discrepancies in the Audit**
**Evidence Supporting the Officers' Fees**

72.     Zhang accepted evidence that purported to support the officers' fees that did not in fact provide support.  In some instances the evidence also was inconsistent with the schedules for the Issuers prepared by Briner purportedly reflecting cash attributable to the Issuers in the Master Trust Account.

73.     On or about October 28, 2012, a De Joya staff accountant asked for documents reflecting the payment of fees to the officers (in the same communication discussed in ¶ 137, above).  The next day, Briner's assistant sent documents reflecting wire transfers from MetroWest to, among others, Crown Capital Partners for $6,000 and Strategic Air Consultants for $4,000. Although Briner's assistant indicated that the wire to Crown Capital Partners was for La Paz's officer (for services to three companies), no other documents made this connection and La Paz's officer was not asked whether he was paid his fee.  Briner's assistant did not state which officer was associated with Strategic Air Consultants, and Zhang did not try to find out.  Nonetheless, Zhang accepted these documents as support for the officers' fees.

74.     Further, the documents reflecting wire transfers from MetroWest to the officers for Canyon and Clearpoint were not consistent with these Issuers' schedules.  The wire transfers were as follows: USD $4,000 to Canyon's officer and C $4,000 to Jewel's officer.  But the schedule Briner provided for Canyon indicates that its officer was paid USD $3,000, and the schedule for

Jewel indicates that its officer was paid USD $3,000 in U.S. currency.  Moreover, the wire transfer documents Briner provided do not indicate when the wire transfers purportedly occurred.  The dates of the transactions listed in the schedules, therefore, cannot be compared with the wire transfer documents provided.

75.     Zhang failed to resolve these conflicts or obtain sufficient appropriate audit evidence to support De Joya's opinions and therefore violated AS 15, AS 12, and AU 230.

### Zhang and Griffith Failed to Detect Basic Accounting Errors and Inconsistencies Between the Financial Statements and the Registration Statements

76.     Under AU 230, "[a]n auditor should possess 'the degree of skill commonly possessed' by other auditors and should exercise it with 'reasonable care and diligence' (that is, with due professional care)" (at .05).  Further, under AS 7, an engagement quality review partner should "review the financial statements" and "read other information in documents containing the financial statements to be filed with the Securities and Exchange Commission . . . and evaluate whether the engagement team has taken appropriate action with respect to any material inconsistencies with the financial statements or material misstatements of fact of which the engagement quality reviewer is aware" (¶ 10 f. and g.).

77.     During the audits and engagement quality reviews, Zhang and Griffith failed to detect basic mistakes in the Issuers' financial statements and inconsistencies between the financial statements and information contained in other parts of the registration statements as reflected in the chart under Appendix A.

78.     Mistakes in the financial statements include, among other things, balance sheets that do not foot and conflicts between balance sheets and the notes to the financial statements. Inconsistences between the financial statements and other information in the registration statements include, among other things, the disclosure of a net loss in the registration statement that conflicts with what should be the same disclosure in the Statement of Operations in the financial statements.  These errors may constitute material misstatements and reflect Zhang and Griffith's apparent lack of due care in conducting their audits and engagement quality reviews, respectively.

79.     For the reasons contained in the chart under Appendix A, Zhang failed to meet AU 230 and Griffith failed to meet AU 230 and AS 7.

### RESPONDENTS VIOLATED SECTION 17(a) OF THE SECURITES ACT, RULE 2-02 OF REGULATION S-X, AND ENGAGED IN IMPROPER PROFESSIONAL CONDUCT

80.     De Joya falsely stated in its audit reports filed with each of the nine issuers' registration statements that they "conducted [their] audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that the financial statements present the Issuers' financial positions "in conformity with U.S. generally accepted accounting principles."  Zhang signed or consented to the filings of these audit reports and Authur De Joya and Griffith provided concurring approval of issuance.

81.     Additionally, De Joya and the De Joya Partners failed to meet the PCAOB standards discussed herein.

13

82.    For these false reports, De Joya and the De Joya Partners collected a total of $37,500 in fees.

83.    De Joya and the De Joya Partners knew, or were reckless in not knowing, that each of the Issuers for which they provided audit reports was a device, scheme, or artifice to defraud in violation of Section 17(a)(1) of the Securities Act. Further, by providing such reports, De Joya and the De Joya Partners acted unreasonably and caused the Issuers' violations of Sections 17(a)(1), (2), and (3) of the Securities Act. De Joya and the De Joya Partners also violated Sections 17(a)(2) and (3) of the Securities Act by falsely claiming that their audits complied with PCAOB standards.

84.    Additionally, for failing to meet the PCAOB audit standards identified above in auditing the Issuers, De Joya and the De Joya Partners engaged in improper professional conduct pursuant to the Commission's Rules of Practice Rule 102(e)(1)(ii) by each engaging in at least one instance of highly unreasonable conduct or at least two instances of unreasonable conduct under Rule 102(e)(1)(iv). Further, De Joya violated Rule 2-02(b)(1) of Regulation S-X by providing audit reports included in the Issuers' Form S-1 Registration statements that falsely state that the Issuers' audits were made in accordance with PCAOB standards. The De Joya Partners caused De Joya's violations of Rule 2-02(b)(1) of Regulation S-X by consenting to the filing of these audit reports.

85.    Further, as described above, De Joya and the De Joya Partners willfully violated Sections 17(a)(1), (2), and (3) of the Securities Act thereby engaging in conduct subject to the Commission's Rules of Practice Rule 102(e)(1)(iii).

## COMMISSION FINDINGS

Based on the foregoing, the Commission finds that:

A.    Respondents willfully violated Sections 17(a)(1), (2), and (3) of the Securities Act;

B.    Respondents engaged in improper professional conduct pursuant to Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice;

C.    De Joya violated Rule 2-02(b)(1) of Regulation S-X;

D.    the De Joya Partners caused violations of Rule 2-02(b)(1) of Regulation S-X; and

E.    Respondents willfully violated Sections 17(a)(1), (2), and (3) of the Securities Act thereby engaging in conduct subject to Section 4C(a)(3) of the Exchange Act and Practice Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Sections 4C and 21C of the Exchange Act, it is hereby ORDERED that:

14

A.      Respondents shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(1), (2), and (3) of the Securities Act and Rule 2-02(b)(1) of Regulation S-X.

B.      Respondent De Joya is denied the privilege of appearing or practicing before the Commission as an accountant.

C.      After five years from the date of this Order, De Joya may request that the Commission consider its reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as an independent accountant.  Such an application must satisfy the Commission that:

a)      De Joya is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective.  However, if registration with the Board is dependent upon reinstatement by the Commission, the Commission will consider the application on its other merits;

b)      De Joya has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

c)      De Joya has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

d)      De Joya acknowledges its responsibility, as long as it appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

D.      The Commission will consider an application by De Joya to resume appearing or practicing before the Commission provided that its state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Respondent's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

E.      Respondent De Joya shall pay disgorgement of $37,500.00 and prejudgment interest of $2,903.79, and a civil penalty of $18,750.00, for a total of $59,153.79, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3), which shall be paid in the following installments: (1) $14,788.44 within 10 days of the entry of this Order; (2) $14,788.44 within 120 days of the entry of this Order; (3) $14,788.44 within 210 days of the entry of this Order; and (4) $14,788.47 within 300 days of entry of this Order.  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600 or 31 U.S.C. § 3717.

15

F.      Respondent Zhang is denied the privilege of appearing or practicing before the Commission as an accountant.

G.      After five years from the date of this Order, Zhang may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a)      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Zhang's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b)      an independent accountant.  Such an application must satisfy the Commission that:

i.      Zhang, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

ii.      Zhang, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

iii.      Zhang has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

iv.      Zhang acknowledges his responsibility, as long as Zhang appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

H.      The Commission will consider an application by Zhang to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Zhang's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

I.      Respondent Zhang shall pay a civil penalty of $25,000.00, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3), which shall be paid in the following installments:  $5,000.00 within 10 days of the entry of this Order, and $20,000.00 in four installments of $5,000.00 due on October 1, 2015, January 1, 2016, April 1, 2016, and one year from entry of this Order.   If timely

payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

J.      Respondent Griffith is denied the privilege of appearing or practicing before the Commission as an accountant.

K.      After three years from the date of this Order, Griffith may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a)      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Griffith's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b)      an independent accountant.  Such an application must satisfy the Commission that:

i.      Griffith, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

ii.      Griffith, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Griffith's or the firm's quality control system that would indicate that Griffith will not receive appropriate supervision;

iii.      Griffith has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

iv.      Griffith acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

L.      The Commission will consider an application by Griffith to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider his application on other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Griffith's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

M.      Respondent Arthur De Joya is denied the privilege of appearing or practicing before the Commission as an accountant.

17

N.      After three years from the date of this Order, Arthur De Joya may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a)      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Arthur De Joya's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b)      an independent accountant.  Such an application must satisfy the Commission that:

i.      Arthur De Joya, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

ii.     Arthur De Joya, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Arthur De Joya's or the firm's quality control system that would indicate that Arthur De Joya will not receive appropriate supervision;

iii.    Arthur De Joya has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

iv.     Arthur De Joya acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

O.      The Commission will consider an application by Arthur De Joya to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider his application on other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Arthur De Joya's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

P.      Respondent Griffith shall pay a civil penalty of $15,000.00, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3), which shall be paid in the following installments:  $3,000.00 within 10 days of the entry of this Order, and $12,000.00 in four installments of $3,000.00 due on October 1, 2015, January 1, 2016, April 1, 2016, and one year from entry of this Order.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Q.      Respondent Arthur De Joya shall pay a civil penalty of $15,000.00, to the Securities

18

and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3), which shall be paid in the following installments: $3,000.00 within 10 days of the entry of this Order, and $12,000.00 in four installments of $3,000.00 due on October 1, 2015, January 1, 2016, April 1, 2016, and one year from entry of this Order. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

R.    Payment of disgorgement and civil penalties as described herein must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying the Respondent by name in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Lara Shalov Mehraban, Division of Enforcement, Securities and Exchange Commission, 200 Vesey Street, NY 10281.

S.    The Division of Enforcement ("Division") may, at any time following the entry of this Order, petition the Commission to: (1) reopen this matter to consider whether Respondent provided accurate and complete financial information at the time such representations were made; and (2) seek an order directing payment of disgorgement and pre-judgment interest. No other issue shall be considered in connection with this petition other than whether the financial information provided by Respondent was fraudulent, misleading, inaccurate, or incomplete in any material respect. Respondent may not, by way of defense to any such petition: (1) contest the findings in this Order; (2) assert that payment of disgorgement and interest should not be ordered; (3) contest the amount of disgorgement and interest to be ordered; or (4) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

T.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset,

19

Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S. C. §523, that the findings in this Order are true and admitted by Respondents, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondents of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Brent J. Fields
Secretary

20

**Appendix A**

| Issuer | Engagement Partner | EQR Partner | Audited Financial Statement Errors/ Conflict Between Audited Financial Statements and Other Registration Statement Information |
|---|---|---|---|
| Tuba City | Zhang | Griffith | Audited Financial Statement Errors<br>• The Total Liabilities and Stockholders' Equity amount on the Balance Sheet on Page F-3 does not foot.  It is reported as $27,325, but the accurately footed amount is $19,825.<br>• The amounts for Net Cash Used in Operating Activities of $(10,175), Net Cash Used in Investing Activities of $(7,500) and Net Cash Provided by Financing Activities of $30,000 do not foot to the amount presented as Increase in Cash on the Statement of Cash Flows on Page F-6.  The amount presented is $19,825, but the amount accurately footed is $12,325.<br>• Note 3, Acquisition of a Mineral Claim, on Page F-11 discloses that "the acquisitions costs have been impaired and expensed during 2012."  The line Mineral property for $7,500 on the Balance Sheet on Page F-3 and the Statement of Operations on page F-4 reflect an unimpaired amount.<br>• Note 6, Going Concern on page F-11, discloses that the company "has incurred a loss of $4,008."  This amount does not match the Net loss of $10,175 presented on the Statement of Operations on Page F-4.<br>• Note 7, Income Tax on Page F-11, discloses that the company "has $4,008 of net operating losses carried forward."  This amount does not match the Net loss of $10,175 presented on the Statement of Operations on Page F-4.  The SEC staff has not found any audit workpapers related to income taxes.<br>Conflicts Between Audited Financial Statements and Other Registration Statement Information<br>• The Net loss from operations of $4,008 in the Consolidated Statements of Income under Summary Financial Information on Page 5 does not match the same line item on the Statement of Operations on Page F-4 of $(10,175).  The period for the $4,008 amount, however, was not specified.<br>• The accounts payable amount of $1,333 in the Balance Sheet Data under Summary Financial Information on Page 5 does not match the same line item on the Balance Sheet on Page F-3, which is $0.<br>• The deficit accumulated during exploration period amount of $(4,008) in the Balance Sheet Data under Summary Financial Information on Page 5 does not match the same line item on the Balance Sheet on Page F-3, which is $(10,175). |
| Canyon | Zhang | Griffith | Audited Financial Statement Error<br>• The Stockholder's Equity section of the Balance Sheet does not foot.  The amount reported is $25,325, but the accurate footing is $24,325. |

21