ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
      sean@mlolega.com

*Lead Counsel for the Paysign Investor Group*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE PAYSIGN, INC. SECURITIES LITIGATION | Case No. 2:20-cv-00553-GMN-DJ<br><br>Hon. Gloria M. Navarro |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **I.** | **INTRODUCTION** | 1 |
| **II.** | **STATEMENT OF FACTS** | 4 |
| **III.** | **ARGUMENT** | 7 |
|  | A. Standard of Review | 7 |
|  | B. The Complaint Adequately Pleads Scienter | 9 |
|  | 1. Defendants Knew or Recklessly Disregarded that the Company's Internal Controls Were Ineffective | 9 |
|  | 2. The CW Allegations and Defendants' Own Admissions Enhance an Inference of Scienter | 14 |
|  | 3. The Complaint Alleges Motive, Even Though It Is Not Required | 21 |
|  | C. The Complaint States a Claim of Control Person Liability | 24 |
| **IV.** | **CONCLUSION** | 24 |

# **TABLE OF AUTHORITIES**

**Page(s)**

*Abdo v. Fitzsimmons*,
No. 17-cv-00851-TSH, 2021 WL 616324 (N.D. Cal. Feb. 17, 2021) ...................12

*Azar v. Yelp, Inc.*,
No. 18-cv-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...............23

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................9, 11, 17

*Brendon v. Allegiant Trading Company*,
412 F.Supp.3d 1244 (D. Nev. 2019).....................................................................22

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..................................................................................19

*Christine Asia Co. v. Yun Ma*,
718 F. App'x 20 (2d Cir. Dec. 5, 2017) ..................................................................13

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ....................................................................12

*Dirks v. S.E.C.*,
463 U.S. 646 (1983)................................................................................................22

*Dobina v. Weatherford Int'l*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ....................................................................13

*George v. China Auto. Sys., Inc.*,
No. 11–CV–7533, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................23

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....................................................................13

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015)....................................................................17

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................................24

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ...............................................................................7, 8

*In re BellSouth Corp. Sec. Litig.*,
355 F. Supp. 2d 1350 (N.D. Ga. 2005) ...............................................................3

*In re BofI Holding, Inc. Sec. Litig.*,
No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980
(S.D. Cal. May 23, 2017) ...............................................................12, 13

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ...............................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................23

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...............................................................14

*In re Extreme Networks, Inc. Sec. Litig.*,
No. 15-cv-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018).................17

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...............................................................12

*In re MF Global Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...............................................................10

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................................13

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...............................................................13

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...............................................................9, 16, 21

*In re Read-Rite Corp.*,
335 F.3d 843 (9th Cir. 2003) ...............................................................12

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...............................................................22

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
No. 02-266-B, 2004 WL 2348315 (D.N.H. Oct. 14. 2004).....................................3

*In re Verifone Holdings Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ...............................................................8

*In re Zillow Grp., Inc. Sec. Litig.*,
No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)...................17

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .........................................................................4

*Kipling v. Flex Ltd.*,
No. 18-cv-02706-LHK, 2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ..........15, 18

*Lechner v. Infusystem Holdings, Inc.*,
No. 2:16-cv-08295, 2017 WL 11593803 (C.D. Cal. Dec. 15, 2017).....................17

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .......................................................................12

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .....................................................................18

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007)............................................................23

*Malin v. XL Capital Corp.*,
312 F. App'x 400 (2d Cir. 2009) ..................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)......................................................................................8

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ................................................................21, 22

*Olvera v. County of Sacramento*,
No. 10-550 WBS CKD, 2012 WL 273158 (E.D. Cal. Jan. 30, 2012) .....................4

*Petrie v. Elec. Game Card, Inc.*,
761 F.3d 959 (9th Cir. 2014) .........................................................................8

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .......................................................................19

*Robb v. Fitbit, Inc.*,
No. 16-cv-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017).......................13

*Roberts v. Zuora*,
No. 19-cv-03422-SI, 2020 WL 2042244 (N.D. Cal. April 28, 2020)....................16

*Schlagal v. Learning Tree Int'l*,
No. 98-6384, 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998)...............................21

*S.E.C. v. Dunn*,
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) ...................................................................17

*S.E.C. v. Small Bus. Capital Corp.*,
    No. 5:12-CV-3237 EJD, 2013 WL 4455850 (N.D. Cal. Aug. 16, 2013) ...............3

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................................................9

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009)...................................................................23

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................8, 9

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...............................................................................16

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................14, 17, 18

**Statutes**

Sarbanes-Oxley Act of 2002 .......................................................................................6

**Rules**

17 C.F.R. §240.10b..................................................................................................8, 23

PSLRA .............................................................................................................3,14, 21

Fed. R. Civ. P. 12(b)(6).................................................................................................7

## I. INTRODUCTION

There is no dispute that Defendants repeatedly misled investors about the effectiveness of Paysign Inc.'s (or the "Company's") internal controls over financial reporting and information technology general controls. Defendants do not contest that they made numerous materially false statements repeatedly throughout the Class Period between March 12, 2019 and March 31, 2020. Nor do Defendants contest that the revelation of the truth regarding the falsity of their Class Period statements repeatedly caused the price of the Company's stock to decline. Defendants challenge only the element of scienter, but ignore the majority of the false statements pled in the Complaint, fail to meaningfully differentiate between the three different internal control deficiencies, and actually provide additional evidence that raises a strong inference that they acted with knowing or reckless disregard for the truth. There are three internal control deficiencies in this case, each of which Defendants knew about or recklessly disregarded, even though they repeatedly claimed that they had evaluated the Company's internal controls and concluded that they were effective:

- Defendants allowed Arthur De Joya ("De Joya"), an accountant subject to a publicly available SEC cease-and-desist order, to prepare the Company's financial reports when the cease-and-desist order explicitly prevented him from working on such matters. Defendants ultimately admitted that employing De Joya was a material weakness in internal controls. Complaint at ¶¶40-45, 81.[1]

- Paysign's journal entries contained basic errors that rendered the Company unable to properly recognize revenue, constituting a second material weakness in internal

---

[1] Citations to "¶ __" refer to paragraphs in the Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws ("Complaint").

1

controls over financial reporting (which the Company did not specifically disclose although it admitted that there were three material weaknesses). ¶80.

- Defendants admittedly failed to maintain effective information technology general controls. ¶¶47-48, 51, 75. This weakness caused inaccurate balances to be reported on card holder accounts. ¶75.

On March 16, 2020, the Company admitted multiple material weaknesses in its internal controls over financial reporting and information technology general controls, which caused Paysign to announce that it was unable to timely file its 2019 Annual Report or to convene its March 31, 2020 earnings call "to complete its year end closing procedures." On this news, the price of Paysign's common stock declined by 17% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020 and continued to drop for the next two days until it closed at $4.06 per share on March 18, 2020. In April 2020, the Company again confirmed in its Annual Report multiple material weaknesses in internal controls over financial reporting in 2017, 2018, and 2019, as well as material weaknesses in information technology general controls, and the auditor opinion in the Annual Report specifically noted that Paysign lacked sufficient internal controls to prevent and terminate the employment of an individual barred from practicing before the SEC. ¶79.

During the Class Period, Defendants Mark Newcomer and Spence collectively reaped over $3.5 million in insider sales while investors suffered losses due to their misrepresentations during the Class Period.

Evoking the pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), Defendants seek dismissal,[2] arguing that the Complaint fails to plead a strong inference that they acted with the requisite state of mind. Defendants' own Motion, however, acknowledges that the SEC's cease-and-desist order prohibited the banned accountant, De Joya, from preparing any statement, opinion or paper incorporated in any filing with the SEC, which he, in fact, did in violation of the order since the Company admitted in its Annual Report that allowing him to work on financial matters constituted an internal control deficiency based on that order. Def. Br. at 5 n.5. Defendants do not dispute that they were aware that De Joya was banned. Reaching outside the pleadings, Defendants now claim that they were told by the Company's independent auditors that the banned accountant could not work on the Company's financials, but that this merely amounts to a "difference of opinion [that] does not implicate concepts of fraud." Def. Br. at 6. It does.

Courts across the country have held that ignoring red flags raised by auditors raises an inference of scienter under the PSLRA. *See SEC v. Small Bus. Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at *13-15 (N.D. Cal. Aug. 16, 2013) (ruling that disregarding the advice of auditors raises an inference of scienter); *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1378 (N.D. Ga. 2005) (noting that ignoring financial errors challenged by auditors gives rise to an inference of scienter); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, Case No. 02-266-B, 2004 WL 2348315, *12 (D.N.H. Oct. 14. 2004) (finding that the adoption of accounting practices "in disregard of advice provided by the company's outside auditors" amounted to fraud).[3]

---

[2] Plaintiffs cite to Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint for Violation of the Securities Laws ("Motion") as "Def. Br. at __."

[3] Regarding Defendants' attempt to rely on a self-serving statement from Paysign's SEC filings concerning the opinion of counsel concluding that De Joya's work did not constitute a "compliance failure," Plaintiffs note that Defendants fail to identify the law firm and the lawyers

Defendants fail to meaningfully engage with the Complaint's detailed allegations about all three internal control deficiencies. As fully explained below, Defendants' remaining arguments, which attempt to divert the Court's attention from the gravamen of the Complaint, are equally unavailing. Therefore, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

## II.     STATEMENT OF FACTS

Paysign provides prepaid card processing services for corporate, consumer and governmental applications. ¶31. The Company derives revenue from setting up and managing prepaid cards and generates nearly all of its revenue from the plasma donation and pharmaceutical industries. ¶¶33-34. Defendants Newcomer and Spence founded the Company in 2001. ¶31.

Paysign has retained a number of accounting firms, replacing some of them under a cloud of suspicion. ¶¶35-39. De Joya served as Paysign's CFO from 2007 to 2015. ¶35. De Joya was also the principal partner of both De Joya & Company and De Joya Griffith LLC. ¶40. In September 2015, the SEC sanctioned De Joya for willfully violating Section 17(a) of the

---

who provided this conflicting advice, fail to produce any memo from the purported law firm or explain the nature of the opinion or the meaning of the term "compliance failure," or provide any necessary context to assess the nature of the affirmative defense. Putting aside the fact that courts cannot assume the truth of such a representation, *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000-08 (9th Cir. 2018) (reversing dismissal based on an improper application of judicial notice and the incorporation by reference doctrine where the district court repeatedly assumed the truth of disputed facts contained in defendants' SEC filings), there are still more problems. Advice of counsel is an affirmative defense that an opposing party is allowed to test in discovery. *See e.g.*, *Olvera v. County of Sacramento*, No. Civ. 10-550 WBS CKD, 2012 WL 273158, at *3 (E.D. Cal. Jan. 30, 2012). Furthermore, the failure to identify the law firm and lawyers involved is particularly problematic since Quinn Williams, a partner at Greenberg Traurig LLP ("Greenberg") sits on Paysign's Board of Directors since April 2018 and was a member of the Board's Audit Committee for part of the Class Period, and Greenberg now defends the Defendants in this lawsuit. It is thus curious that Defendants would not identify the law firm or the lawyers involved in providing advice that allegedly contradicted the auditors and flouts the plain meaning of the cease-and-desist-order given Greenberg's potential conflicts.

Securities Act and Rule 2-02 of SEC Regulation S-X, prohibiting him from appearing or practicing before the SEC as an accountant for three years in connection with a client's fraud scheme. ¶¶35, 41. The term "practicing" is interpreted by the SEC broadly to include not just the ultimate documents filed with the SEC, but "computing figures and supplying the data incorporated" in SEC filings and consenting to their incorporation. ¶41 n.4. The cease-and-desist order against De Joya is publicly available and De Joya to this day is identified as one of only 96 prohibited accountants in the United States by OTC Markets, a financial market that provides price and liquidity information for nearly 10,000 over-the-counter securities. ¶44.

With actual knowledge of the cease-and-desist order against De Joya and its prohibitions, Defendants improperly allowed him to participate in preparing Paysign's financial statements between 2017 and 2019 under Defendant Attinger's direction. ¶45. According to former employees with first-hand knowledge, De Joya worked on the Company's financial statements and other public documents that the Company filed with the SEC. ¶¶46, 49.

On March 12, 2019, the Company filed its 2018 10-K, signed by Defendants Newcomer, Attinger, and Spence. ¶55. The 2018 10-K acknowledged that Paysign's stock price *could* decline if material weaknesses in the Company's internal controls were identified. The risk was not potential, however, because it had already occurred as Defendants knowingly allowed De Joya to prepare and work on the financials contained in Paysign's SEC filings. The 2018 10-K further stated that the Company's success depended on the retention of key personnel but did not disclose the existing impairment of De Joya working on Paysign's financial statements, which effectively barred him from working on the financials. ¶¶55-56.

As for the second weakness in internal controls over financial reporting, during the Class Period, Defendant Attinger worked directly with CW6 to correct basic errors in the Company's

journal entries that rendered it unable to properly recognize revenue, but Defendants did not disclose this fact. ¶¶53-54. With respect to the third internal control weakness, which relates to information technology general controls, according to CW2, during the Class Period, Defendant Spence regularly re-programmed the Company's internal system that stored customer account profiles. ¶48. CW2 states that Defendant Spence's changes caused customers' account balances to materially differ from the actual balances on their accounts, causing many calls and complaints about the discrepancies. ¶48. According to CW5, a former front-end developer in Paysign's IT department, the material weakness that Paysign eventually admitted, relating to access to "privileged user accounts" and "change management to financial applications," referred to Spence's software changes. ¶¶52-53. CW2 asserts that the Company's Chief Operating Officer, Joan Herman, told Defendant Newcomer about this problem. ¶48.

Despite these numerous internal control weaknesses, Defendants repeatedly told investors that Newcomer and Attinger had evaluated the effectiveness of Paysign's internal controls and concluded that such controls were effective throughout the Class Period in multiple financial statements filed with the SEC. ¶¶67-72.

On March 16, 2020, Paysign announced that the Company would be unable to file its Annual Report for the fiscal year that ended on December 31, 2019. The Company admitted that "in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with [SOX] 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls." ¶75. On this news, the price of Paysign's common stock declined by nearly 17% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020, on unusually heavy trading volume. The price of Paysign's

common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020. ¶76.

On March 31, 2020, Paysign announced that it would postpone its earnings results call scheduled for that same day "to complete its year-end closing procedures," triggering another decline in the value of its stock, which fell by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020. The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share. ¶¶77-78.

When Paysign filed its Annual Report for 2019 on April 3, 2020 (the "2019 10-K"), the 2019 10-K admitted that "the Company lacked sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018 and 2019." ¶79. Paysign further admitted materially ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management. ¶80.

During the Class Period, Defendants Newcomer and Spence collectively earned over $3.5 million from sales of Paysign common stock. ¶73. By contrast, neither Newcomer nor Spence sold any stock in the twelve-month period before the Class Period began. ¶74.

## III. ARGUMENT

### A. Standard of Review

On a Rule 12(b)(6) motion, plaintiffs' allegations are accepted "as true" and courts "construe them in the light most favorable to [p]laintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017) (quotation marks and citations omitted). Section 10(b) of the Exchange Act makes it unlawful to "make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. §240.10b-5(b)). The elements of a claim are: (1) a misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d at 793. Defendants challenge only the adequacy of the Complaint's scienter allegations.

In evaluating scienter, "the court reviews all allegations holistically, rather than in isolation, to determine if a complaint is well-pleaded." *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014). A complaint adequately pleads scienter if the specific facts allege reckless conduct that involves "an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Verifone Holdings Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (internal citations omitted).

To determine whether a complaint adequately pleads a strong inference of scienter, courts must consider "*all* of the facts alleged, taken collectively, and refrain from "scrutiniz[ing] [them] in isolation." *In re Verifone Holdings*, 704 F.3d at 701 (internal quotation marks and citations omitted) (emphasis in original). A complaint should survive a motion to dismiss if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). A court also can infer scienter from circumstantial evidence. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017).

### B. The Complaint Adequately Pleads Scienter

#### 1. Defendants Knew or Recklessly Disregarded that the Company's Internal Controls Were Ineffective

Defendants knew or recklessly ignored that the alleged misstatements in the Amended Complaint were materially false or misleading. In *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008), the Ninth Circuit held that the inference of recklessness is sufficiently strong to find scienter where the facts are so "patently obvious" that it would be "absurd to suggest that top management was unaware of them." This is precisely the case here.

Defendants knowingly allowed their former C-suite colleague of many years, Paysign's former CFO, to work on the Company's financial reports despite a cease-and-desist order specifically banning him from doing so. The SEC order, which is publicly available, prohibits De Joya from working on any financial matter that is incorporated into an SEC filing. Defendants were also told by their independent auditors that De Joya could not prepare or work on Paysign's financials under the terms of the cease-and-desist-order. Not only Defendants, but rank-and-file Paysign employees, knew about the ban. De Joya's work on Paysign's financials was a material weakness in internal controls that existed when Defendants repeatedly told investors that internal controls were effective.

It would not be reasonable for the Court to infer – and, indeed, Defendants do not claim – that the Individual Defendants, who knew and worked with De Joya for years, did not know that he was not permitted to work on the Company's financial statements to be filed with the SEC. Newcomer, as the Company's CEO and founder, and Attinger, as CFO, both worked directly with De Joya and were responsible for the accuracy of Paysign's financial reporting. Spence, a co-founder of the Company, had also worked with De Joya for years, including in the C-suite, and had a front row seat to his SEC discipline. ¶31.

With respect to the second material weakness in internal controls over financial reporting, CW6 stated that CW6 worked directly with Defendant Attinger in an attempt to correct material errors in Paysign's journal entries. Based on CW6's work with Attinger, CW6 stated that Attinger knew about the errors. ¶54. This second material weakness in Paysign's internal controls over financial reporting existed during the Class Period and resulted in a failure to properly recognize revenue, but was not disclosed even though Attinger knew about it.

As for the Company's third material weakness, related to information technology general controls, Defendant Spence reprogrammed Paysign's software, causing inaccuracies in customers' card balances. According to CW2, the COO of Paysign told Defendant Newcomer about this material weakness during the Class Period. Defendants nevertheless failed to disclose it. ¶¶ 47-48. These allegations raise an inference of scienter. *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (finding scienter where defendants "knew or should have known about the weaknesses in [defendants'] internal controls" because of reports noting failure to follow accepted policies, yet made statements to the contrary).[4]

---

[4] Defendants claim that they are confused regarding why statements concerning potential risks about the Company's computer network systems are false even though they do not challenge falsity in their Motion. *See* Def. Br. at 18-19. The discussion of risks from technology failures in

Nevertheless, during the Class Period, Defendants repeatedly certified that the Company's internal controls were effective, even though they were aware of the material weaknesses noted above. *See* ¶¶55-72. On April 6, 2020, the Company's Annual Report admitted that material weaknesses in internal controls over financial reporting existed because De Joya was allowed to work on financial statements for 2017, 2018 and 2019, and further admitted materially ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management, which CW5 explains was a reference to Defendant Spence's software changes. ¶¶52, 79-80. The Annual Report conceded that there were three different material weaknesses, which would also include the basic errors in Paysign's books during the Class Period, which Defendant Attinger attempted to fix. ¶80.

The Complaint pleads additional particularized facts that support a strong inference that each of the Defendants knew or recklessly disregarded the ineffectiveness of the Company's internal controls and the problems to which those ineffective controls led. Paysign is not a large company. As of March 3, 2020 it had only 70 employees and independent contractors. ¶31. Its accounting function consisted of five people, including Defendant Attinger. ¶54. De Joya was involved with the Company as far back as 2007, as CFO, and continued to work on the financials after the SEC enforcement action against him. His tenure as CFO ended with his SEC ban, which was common knowledge throughout the Company, although he continued to work in the accounting department. ¶¶35, 41, 49. Defendants admitted that employing De Joya was a material

the hypothetical rendered Paysign's risk disclosures materially misleading, as they warned only that a risk could impact Paysign's business when that risk had already materialized. *See Berson*, 527 F.3d at 986 (disclosing "as-yet-unrealized risks and contingencies" is misleading when the risks have already materialized).

failure of the Company's internal controls over financial reporting, that there were other unspecified internal control weaknesses over financial reporting along with additional weaknesses in information technology general controls. ¶¶75-81. Post-class period admissions bolster an inference of scienter. *See In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) ("[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). All of these allegations suffice to adequately plead scienter. *See Abdo v. Fitzsimmons*, Case No. 17-cv-00851-TSH, 2021 WL 616324, at *12-13 (N.D. Cal. Feb. 17, 2021) (finding scienter where directors signed documents authorizing the issuance of shares despite knowing that management was behaving improperly); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 631, 638 (S.D.N.Y. 2010) (direct knowledge of information contradicting adequacy of internal controls or "access to similar information should have monitored" regarding practices pleads scienter adequately).

The Court should reject Defendants' attempt to create a blanket amnesty for knowingly or recklessly making false statements about a company's internal controls. Def. Br. at 2. This is not a case where a mere weakness in internal controls is utilized to bootstrap allegations of scienter. Here, Defendants knew or recklessly disregarded facts that put them on notice that very serious internal control deficiencies existed throughout the Class Period, yet they still made false representations about the adequacy of the internal controls. Courts have repeatedly found similar misconduct to be actionable. *See e.g.*, *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1121-22 (N.D. Cal. 2017) (ruling that oversight of internal controls fell squarely within CFO's oversight, and admission of material weaknesses suggests that it would be absurd for the CFO to be blind to the weaknesses); *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC,

2017 WL 2257980, at *12-14 (S.D. Cal. May 23, 2017) (ruling that defendants made false statements about the company's internal controls with scienter when they knew about the bank's lax underwriting and auditing procedures); *In re New Century*, 588 F. Supp. 2d 1206, 1229-30 (C.D. Cal. 2008) (same); *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 n.159 (S.D.N.Y. 2008) (ignoring red flags and ultimately admitting to material weaknesses in a company's internal controls is indicative of scienter). The fact that Defendants Newcomer and Attinger warned of the impact of disclosing internal control weaknesses on Paysign's stock price, stated that they had evaluated the internal controls, knew or recklessly disregarded the numerous weaknesses in the internal controls during the Class Period, and then finally admitted that material weaknesses existed, suffices to plead scienter. *See Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2012) (ruling that personal involvement in evaluating internal controls with awareness of problems, and ultimately admitting that the internal controls were ineffective stated a claim for securities fraud).

The Court should also summarily reject Defendants' attempt to elevate the standard for pleading scienter by presuming that Attinger and Newcomer could not know about the information technology control deficiencies and Spence could not know about deficiencies in financial controls. Def. Br. at 16-17. This suggestion defies logic. Senior executives share material information, especially at a small company like Paysign. *See Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 23 (2d Cir. Dec. 5, 2017) (holding that "it is virtually inconceivable" that senior managers at the company would not relay material information to the individual defendants); *Robb v. Fitbit, Inc.*, Case No. 16-cv-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017)

13

(ruling that reports given to a senior, non-defendant executive would also "have been known to the individual defendants.").

### 2. The CW Allegations and Defendants' Own Admissions Enhance an Inference of Scienter

Defendants challenge the sufficiency of the Complaint's allegations from the CWs, arguing that the Complaint fails to establish the reliability and personal knowledge of the witnesses, and that regardless, the CWs' allegations are not "indicative of scienter." Def. Br. at 8-9 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009)). Defendants are wrong on both counts.

To satisfy the PSLRA's particularity requirement for personal sources of information, a complaint need only describe witnesses "with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Digimarc Corp.*, 552 F.3d at 995 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)). To determine whether a complaint provides an adequate basis for determining that witnesses have personal knowledge of the events they report, courts look to "'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.* (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29-30 (1st Cir. 2002)).

The CWs here are credible and reliable witnesses. The CWs provide detailed – and, critically, consistent – information, reporting both their personal knowledge and demonstrating that certain facts were common knowledge at Paysign, a relatively tiny public company with a

14

small staff.[5] The Complaint's allegations from CW1, CW2, CW3, CW4, CW5, and CW6 are well-pleaded and, together with Defendants' own admissions, support a strong inference that Defendants recklessly misled investors at the least. The Complaint identifies each CW's exact title, job description, the time period during which each held such position, and identifies the company executive to whom CW4 and CW6 reported. ¶¶46-54.

CW1, a senior accountant at the Company from November 2015 to July 2016 – in other words, after De Joya was banned from practicing before the SEC - shared an office with De Joya, and confirmed that De Joya worked on the Company's financial statements and other public documents prepared to be filed with the SEC. ¶46.

CW2, a corporate trainer in the customer service function at Paysign during the Class Period, reported that Defendant Spence made changes to the Company's internal software that caused customers' account balances to materially differ from the actual balances on their accounts, resulting in complaints to the customer service department, an issue that was widely known within the Company. ¶48. CW2 also confirmed that De Joya worked next to the Individual Defendants' offices during the Class Period. ¶47.

CW3, the Senior Director of Pharmaceutical Account Management at the Company from April 2018 to January 2019, personally knew – and stated that employees widely knew – that De Joya was "not legally able to" work on the financials after his SEC ban. ¶49.

CW4, a call center manager at the Company during the Class Period, confirmed CW2's account that software changes caused mistakes in customers' balances from his personal

---

[5] This fact distinguishes Paysign from *Kipling v. Flex*, Case No. 18-cv-02706-LHK, 2020 WL 7261314, at *34 (N.D. Cal. Dec. 10, 2020), a case that focused on a multinational corporation that is the third largest company in its sector worldwide, in which the CWs worked only on unrelated projects. *See* Def. Br. at 8-9.

experience fielding customer calls. He also reported that De Joya told him personally that he had worked closely with Defendant Newcomer for years, and observed that De Joya's office was next to Defendant Attinger's, and that he also worked directly with Defendant Attinger. ¶¶50-51.

CW5, a front-end developer in Paysign's IT department during the Class Period, explained that the material weakness in the Company's information technology controls that Paysign explained as relating to access to "privileged user accounts," and "change management to financial applications" referred to managing software updates, confirming that Defendant Spence's changes to the Company's software caused its material weakness. ¶¶52-53.

CW6, an accounting manager at Paysign during the Class Period who reported directly to Defendant Attinger, reported that the Company's revenue contained material errors because an automatic feed did not transfer the Company's bank account information into NetSuite, an accounting software used by the Company. CW6 worked with Attinger to correct these errors. ¶54.

Defendants' attempt to dismiss the CWs by reference to some of their short tenure at Paysign is misplaced. *See, e.g.*, Def. Br. at 9-10. That a CW did not work at the Company during the entire Class Period (or, indeed, during the Class Period at all) does not render their statements unreliable. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (holding that the district court acted correctly in considering the statements of CWs who were not employed during the class period because information from before the class period is relevant, as it can confirm what a defendant should have known during the class period); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1145 (accepting allegations from a CW who was not employed at the company during Class Period but had personal knowledge of the issue in the case); *Roberts v. Zuora*, Case No. 19-cv-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. April 28, 2020).

Indeed, the fact that the CWs were able to ascertain these facts in relatively short tenures at the Company shows that Paysign's internal control failures were so blatant that they were immediately obvious (and, in fact, common knowledge at the Company), and Defendants were reckless if they failed to discover and correct this issue. *See S.E.C. v. Dunn*, 587 F. Supp. 2d 486, 507 (S.D.N.Y. 2008). The individual reliability of each CW's account is strengthened by the fact that their accounts corroborate each other, with several employees providing the same or similar allegations. *Zucco*, 552 F.3d at 995; *see also In re Extreme Networks, Inc. Sec. Litig.*, Case No. 15-cv-04883-BLF, 2018 WL 1411129, at *27 (N.D. Cal. March 21, 2018) (finding CWs' accounts indicative of scienter as "the CWs corroborate each other with respect to what was going on internally at [the company], which further supports the reliability of their statements") (citing *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015)); *In re Zillow Grp., Inc. Sec. Litig.*, Case No. C17-1387-JCC, 2019 WL 1755293, at *5 (W.D. Wash. Apr. 19, 2019) (ruling that the "consistent and interlocking nature of [CW] testimony bolsters the evidence's reliability and credibility").

That Paysign employed the CWs in various functions also corroborates that Defendants' contemporaneous knowledge contradicted their public statements, as it makes clear that their knowledge was also common knowledge at the Company. *See, e.g., Berson*, 527 F.3d at 985 ("any number of company employees would be in a position" to know the alleged facts, and disputes over witnesses' accounts "must at least await discovery"). By contrast, the plaintiff in *Lechner v. Infusystem Holdings, Inc.*, Case No. 2:16-cv-08295, 2017 WL 11593803, at *3 (C.D. Cal. Dec. 15, 2017) relied on allegations from a single witness. *See* Def. Br. at 8.

Defendants assert that the CW allegations are hearsay, rendering them somehow less reliable. First, this argument is conclusory; Defendants do not and cannot specify exactly how the

17

CW allegations are hearsay, because each speaks to their own personal knowledge. Def. Br. at 9. Second, the Federal Rules of Evidence do not apply to pleadings. That is, a complaint may rely on hearsay, so long as the witness who recounts it was positioned to know the information and was a participant in the conversation at issue. *Zucco*, 552 F.3d at 997 n.4. The Ninth Circuit refused to credit the *Zucco* witnesses because they were not positioned to know the information alleged and reported ***only*** hearsay. *Id.* at 996. Similarly, the Court did not credit a witness in *Kipling*, 2020 WL 7261314, at *2 because she reported only other colleagues' statements, with very little detail about who they were and when she had those conversations. The CWs, by contrast, personally witnessed the Company's information technology control deficiencies and De Joya's violation of the SEC cease-and-desist order. The Court should consider the CWs' personal experience. *Zucco*, 552 F.3d at 996. *See also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208-09 (9th Cir. 2016) (reversing dismissal because the district court discounted credible allegations from a CW as hearsay to dismiss the complaint).

The Complaint's allegations also satisfy the *Zucco* requirement that the statements of the CWs "must themselves be indicative of scienter." 552 F.3d at 995. Their statements contribute to the strong inference that Defendants, at a minimum, were reckless in permitting De Joya to work on the preparation of Paysign's financial statements for 2017, 2018 and 2019, and permitting Defendant Spence to change the Company's software system materially, resulting in customers having incorrect balance accounts.

Taken collectively, the CWs' statements establish that the Individual Defendants knew or recklessly disregarded the prohibition on De Joya preparing Paysign's financial statements and that Spence's changes to the Company's software system, both evidencing material weaknesses in controls and information technology controls. With respect to De Joya's role, according to

CW6, the five-member accounting function worked directly with Defendant Attinger, the Company's CFO, who personally evaluated the effectiveness of the Company's internal controls over financial reporting. *See, e.g.*, ¶54. At the same time, during the Class Period, De Joya – the Company's former CFO – was sitting next to the Individual Defendants' offices and working closely with Attinger and Newcomer. ¶¶47, 50. CW3 reported as common knowledge in the Company that De Joya was "not legally able to" work on financials. ¶49. Indeed, his account as an outsider to the accounting function confirms that the Individual Defendants were, at a minimum, reckless in not preventing De Joya from participating in this kind of work, since it was common knowledge in the Company that he was not permitted to take part in it.[6] These facts raise the inference that the Individual Defendants, and certainly Attinger, knew that De Joya's participation in the preparation of Paysign's financial statements violated the SEC prohibition. *See City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) ("particularized allegations that defendants had 'actual access to the disputed information,' ... raise a strong inference of scienter.") (quoting *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014)).

Defendants' attempt to discredit the accounts of CW1, CW2, and CW3 about De Joya's role in the accounting function by arguing that his activities did not necessarily violate the SEC's ban (*see* Def Br. at 9-11) ignores that **Defendants themselves** admitted that De Joya's very employment was a control weakness, and that they permitted him to be involved in SEC reporting in violation of his ban in the 2019 10-K. ¶79. The Company would not have had any need to

---

[6] Defendants' assumption that CW6's statement that a "Paysign employee with a CPA license also discussed the accounting errors with Defendant Attinger in person" (Def. Br. at 10) impermissibly presumes that the employee was De Joya misses the mark. This allegation is about Defendant Attinger, not De Joya, and demonstrates his knowledge of the Company's revenue recognition problems.

disclose that it "lacked sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018 and 2019" unless De Joya had, in fact, done so. *Id.*

Reaching outside the pleadings to impermissibly introduce new facts, Defendants now seek to rationalize their misconduct by asserting that they disagreed with their auditors regarding De Joya's working on the Company's financials despite the cease-and-desist order, but Defendants' post-hoc rationalization is not a defense for failing to disclose the problem to investors. The auditors' position on the violation of the cease-and-desist order with respect to financial reporting, at a minimum, raised a red flag, and even if Defendants did not concur in the professional advice of their auditors, the ban raised a material issue regarding the preparation of the financials that should have been disclosed to investors. As fully explained above, disregarding an auditor's advice raises an inference of scienter. *See supra* at 3. Defendants' additional admissions of their knowledge based on the advice of their independent auditors proffered in their Motion regarding their allowing De Joya to continue working on the Company's financials should shut the door on any attempt to seek premature dismissal of Plaintiffs' well-pled Complaint on scienter grounds.

Defendants' attempt to dismiss their failure to maintain effective controls over the Company's software system as "everyday issues that are part of business life with no suggestion of fraud" is also without merit. *See* Def. Br. at 12. Defendants ignore that Defendant Spence, the Company's CTO, personally changed the Company's software in a way that resulted in customer accounts being inaccurate, demonstrating that the Company's information technology general controls were ineffective. ¶¶47-48. The IT controls did not prevent his changes, even as the

Company received numerous customer complaints. ¶48. Defendant Newcomer also knew about the problems created by Spence during the Class Period and failed to respond. ¶50. Finally, Defendants fail to address that CW6 identifies a second material weakness in internal controls over financial reporting related to basic errors in journal entries that rendered the Company unable to properly recognize revenue, which Defendants failed to disclose during the Class Period. ¶54.

Defendants' personal knowledge of numerous material weaknesses in internal controls render their statements attesting to the effectiveness of such controls, at a minimum, reckless. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145 (finding scienter where the individual defendants, themselves, had real-time access to information that turned out to be false). The Court should find that the CWs' allegations support a finding of scienter in this case.

### 3.     The Complaint Alleges Motive, Even Though It Is Not Required

During the Class Period, Defendants Newcomer and Spence sold stock while in possession of material, non-public information. That Attinger did not capitalize on his reckless misconduct is irrelevant. *See Schlagal v. Learning Tree Int'l*, No. 98-6384, 1998 WL 1144581, *17 (C.D. Cal. Dec. 23, 1998) (noting that numerous courts have upheld scienter allegations under the PSLRA when some but not all defendants traded). Defendants' insider stock sales are strong evidence of scienter when those sales are suspicious in terms of: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). None of these factors is dispositive on their own or required. *Id.* In this case, however, all three demonstrate that the Individual Defendants' insider stock sales during the Class Period were suspicious, supporting a strong inference of fraudulent intent.

While Defendants argue that Newcomer's sale of approximately 2.2% of his total Paysign holdings and Spence's sale of approximately 1.4% of his total shares are "inherently

21

unsuspicious," Def. Br. at 13, in fact, such sales can amply support a finding of scienter. *See Oracle*, 380 F.3d at 1232 (holding that suspicious insider sales supported an inference of scienter even where the defendant sold only 2.1% of his holdings); *Brendon v. Allegiant Trading Company*, 412 F.Supp.3d 1244, 1261-62 (D. Nev. 2019) (insider sales supported an inference of scienter where the defendant sold as little as 0.43% of his holdings); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (sale of "only 7.6% of [defendant's] personal holdings" supported an inference of scienter).[7] More, Defendants' argument that the timing of the sales was not suspicious, since the sales were made about six months before the end of the Class Period, is without merit. Defendants knew that, upon disclosure, the Company's material control weaknesses would likely cause the Company's stock price to fall. ¶57. They had no idea, however, when that disclosure would occur. Accordingly, for as long as their controls were materially deficient, the Company's stock price was artificially inflated and Defendants profited from their deceptive conduct. Further, these stock sales were out of line with Newcomer's and Spence's prior trading activity before the Class Period, as neither of these Defendants sold any stock in the 12-month period before the Class Period began. ¶74. Indeed, Defendants had an affirmative duty to refrain from trading on inside information when they sold stock while simultaneously making false statements about the Company's internal controls with reckless disregard for the truth. *See Dirks v. S.E.C.*, 463 U.S. 646, 655 (1983) (noting that the law imposes a duty on a corporate executive to refrain from trading on inside information).

---

[7] In another attempt to contradict the Complaint's allegations, Defendants seek to include sales made pursuant to tax withholdings that were explicitly excluded in the Complaint. *Compare* Complaint at ¶73 n.5 *with* Def. Br. at 15. Regardless, courts in this District have considered insider sales as indicative of scienter even when a defendant sells far less of his or her stock holdings than Newcomer and Spence sold during the Class Period. *See Brendon*, 412 F.Supp.3d at 1261-62 (insider sales supported an inference of scienter where the defendant sold as little as 0.43% of his holdings).

Nor does the 10b5-1 plan that Defendants claim caused their class period sales undermine their suspiciousness. Def. Br. at 16. A Rule 10b5-1 plan provides a defense to insider trading *only if* the plan was "given or entered into in good faith and not as part of a plan or scheme to evade the prohibitions of this section." 17 C.F.R. § 240.10b5-1(c). Courts in this Circuit have declined to entertain an affirmative defense based on trading plans because whether a trading plan was entered in good faith is a factual question that cannot be resolved at the pleading stage. *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009). This is especially true, as *Stocke* notes, where the Rule 10b5-1 plan was formed during the Class Period. *Id.* "[W]here (as here) 10b5-1 trading plans are entered into ***during the class period***, they are not a cognizable defense to scienter allegations on a motion to dismiss. This is because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan." *George v. China Auto. Sys., Inc.*, No. 11–CV–7533, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (emphasis added); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188 (C.D. Cal. 2008) (holding that a Rule 10b5-1 plan was not a defense to scienter allegations where the defendant amended the plan during the class period).

Although Defendants make many arguments about these stock sales, and provide the Court an abundance of related filings, they have notably not chosen to submit the actual trading plans. Therefore, "issues of fact remain with regard to the trading plans." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *see also Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) (stating that 17 C.F.R. § 240.10b5-1(c)(1)(i)(B) requires the trading plan adhere to certain standards and "without reviewing" the trading plan, "the Court cannot determine whether these requirements

23

were met, and cannot conclude that the plan negates any inference of scienter"). Because Defendants instituted the 10b5-1 plans during the Class Period, the contents of the plans are unknown, and the Court should not infer any good faith from the available information, these plans provide no cognizable defense and in no way whatsoever support a competing inference of non-fraudulent intent.

### C. The Complaint States a Claim of Control Person Liability

Because Plaintiffs have adequately alleged a primary violation of Section 10(b) of the Exchange Act, Defendants' motion to dismiss Plaintiffs' Section 20(a) claims on this ground must fail. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the Amended Complaint. If the Complaint is dismissed, Plaintiffs respectfully submit that the dismissal should be without prejudice, and request leave to amend.

Dated: April 29, 2021          Respectfully submitted,

*/s/ Omar Jafri*

**POMERANTZ LLP**

Patrick V. Dahlstrom (admitted *pro hac vice*)
Omar Jafri (admitted *pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com
       ojafri@pomlaw.com

*-and-*

24

Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100


**MUEHLBAUER LAW OFFICE, LTD.**

ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
     sean@mlolega.com

*Attorneys for Paysign Investor Group*